The TORRINGTON COMPANY, Plaintiff,

Federal–Mogul Corporation,
Plaintiff–Intervenor,

v.

UNITED STATES, Defendant,

SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A., SKF (U.K.) Limited and SKF Sverige AB; RHP Bearings and RHP Bearings Inc.; Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; GMN Georg Muller Nurnberg AG; NSK Ltd. and NSK Corporation; NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH; NMB Thai Ltd., Pelmec Thai Ltd., NMB Singapore Ltd., Pelmec Industries Ltd. and NMB Corporation; FAG Kugelfischer Georg Schäfer KGaA, FAG Cuscinetti S.p.A., FAG (UK) Limited, Barden Corporation (UK) Limited, FAG Bearings Corporation and The Barden Corporation; Peer Bearing Company; Ina Walzlager Schaeffler KG and Ina Bearing Company, Inc., Defendant–Intervenors.

Slip Op. 96–85.
Court No. 92–07–00483.

United States Court of
International Trade.

May 31, 1996.

Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, William A. Fennell, Washington, DC, John M. Breen, Troy, MI, Margaret E.O. Edozien, New York City, Robert A. Weaver, Wheaton, MD, Myron A. Brilliant, Geert De Prest, Lane S. Hurewitz, Margaret L.H. Png and Olufemi A. Areola), Washington, DC, for plaintiff.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Washington, DC, Larry Hampel, Silver Spring, MD, Joseph A. Perna, V, Springfield, PA, and J. Eric Nissley, Washington, DC), for plaintiff-intervenor.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis, Assistant Director, Marc E. Montalbine), of counsel: Stephen J. Claeys, Stacy J. Ettinger, Thomas H. Fine, Craig R. Giesze, Jeffrey

M. Telep, Alicia D. Greenidge, Dean A. Pinkert, Edward Reisman and Mark A. Barnett, Attorneys, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

Howrey & Simon (Herbert C. Shelley, Alice A. Kipel, Juliana M. Cofrancesco, Thomas J. Trendl and Anne Talbot, Washington, DC), for defendant-intervenors SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A., SKF (U.K.) Ltd. and SKF Sverige AB.

Covington & Burling (Harvey M. Applebaum, David R. Grace, Washington, DC, and Thomas A. Robertson, Belmont, NC), for defendant-intervenors RHP Bearings and RHP Bearings Inc.

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Neil R. Ellis, T. George Davis, Robert A. Calaff, Lee Ann Alexander and Susan M. Mathews, Washington, DC), for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

Ross & Hardies (Charles W. Petty, Jr., Washington, DC), for defendant-intervenor GMN Georg Muller Nurnberg AG.

Lipstein, Jaffe and Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson, Washington, DC), for defendant-intervenors NSK Ltd. and NSK Corporation.

Barnes, Richardson & Colburn (Donald J. Unger, Robert E. Burke, Kazumune V. Kano, Chicago, IL, Peter Sultan, Washington, DC, and Diane A. MacDonald, Chicago, IL), for defendant-intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH.

White & Case (Walter J. Spak, William J. Clinton, David E. Bond and Edmund W. Sim, Washington, DC), for defendant-intervenors NMB Thai Ltd., Pelmec Thai Ltd., NMB Singapore Ltd., and Pelmec Industries (Pte.) Ltd. and NMB Corporation.

Grunfeld, Desiderio, Lebowitz & Silverman (Max F. Schutzman, New York City, David L. Simon, Washington, DC, Andrew B. Schroth, Matthew L. Pascocello and Mark E. Pardo, New York City), for defendant-intervenors FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti SpA, FAG (UK) Limited, Barden Corporation (UK) Limited, FAG Bearings Corporation and The Barden Corporation.

Venable, Baetjer, Howard & Civiletti (John M. Gurley and Lindsay B. Meyer, Washington, DC), for defendant-intervenor Peer Bearing Company.

Arent Fox Kintner Plotkin & Kahn (Stephen L. Gibson and Eleanor Pelta, Washington, DC), for defendant-intervenors INA Walzlager Schaeffler KG and INA Bearing Company, Inc.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Torrington Company ("Torrington"), challenges certain aspects of the Department of Commerce, International Trade Administration's ("Commerce") final results of redetermination entitled *The Torrington Company v. United States, Slip Op. 95–54 (March 31, 1995), Final Results of Redetermination Pursuant to Court Remand* ("*Remand Results*"), filed on August 14, 1995. The Remand Results concern *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews* ("*Final Results*"), 57 Fed.Reg. 28,360 (June 24, 1992).

### Background

In *Torrington Co. v. United States*, 19 CIT ——, ——, 881 F.Supp. 622, 651 (1995), the Court remanded this case to Commerce to: (1) apply the rate of value added tax ("VAT") forgiven to United States price, calculated at the same point in the stream of commerce as where the VAT is applied for home market ("HM") sales, and to add the resulting amount to United States price ("USP") without a circumstance of sale ("COS") adjustment to foreign market value ("FMV"); (2) deny an adjustment to FMV for HM pre-sale freight expenses where FMV was calculated using purchase price ("PP"); (3) develop a methodology which removes post-sale price

adjustments ("PSPAs") and rebates paid on sales of out-of-scope merchandise from any adjustments made to FMV for PSPAs or rebates, if no viable method could be developed, to deny such adjustments in calculating FMV; (4) add an amount for profit which is not less than the statutory eight percent minimum to FAG Cuscinetti SpA's ("FAG–Italy") cost of production ("COP") data and to make any adjustments to constructed value ("CV") that may be required as a result; (5) address the issues raised by plaintiff concerning the adjustment to FMV for NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH ("NTN") for inventory carrying costs and to set forth the basis for its determination on this issue; and (6) provide a reasonable explanation of why the treatment of "Route B" sales in the Final Results differs from that afforded these sales in the original less than fair value ("LTFV") investigation or, if no explanation can be given, to exclude "Route B" sales from the HM database.

### Discussion

Commerce's final results filed pursuant to a remand will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

### 1. *Value Added Tax*

In *Torrington*, 19 CIT at ——, 881 F.Supp. at 637, the Court directed Commerce to "apply the rate of VAT forgiven to USP, calculated at the same point in the

stream of commerce where the VAT is applied for home market sales, and add the resulting amount to USP, without a COS adjustment to FMV."

Commerce changed its VAT methodology to comply with the Court's instructions. *Remand Results* at 3. Under the new methodology, Commerce

> added to USP the result of multiplying the foreign market tax rate by the price of the United States merchandise at the same point in the chain of commerce that the foreign market tax was applied to foreign market sales. [Commerce] also adjusted the USP tax adjustment and the amount of tax included in FMV. These adjustments deduct (or add) the portions of the foreign market tax and the USP tax adjustment that are the result of expenses that are included in the foreign market price used to calculate foreign market tax and are included in the United States merchandise price used to calculate the USP tax adjustment, which we later deduct to calculate FMV and USP (or which were excluded from the price, but later added). These adjustments to the amount of the foreign market tax and the USP tax adjustment are necessary to prevent our new methodology for calculating the USP tax adjustment from creating dumping margins where no margins would exist if no taxes were levied upon foreign market sales.

*Id.* Although Commerce has complied with the Court's instructions, a further remand is appropriate.

■ Recently, the United States Court of Appeals for the Federal Circuit ("CAFC") in *Federal–Mogul Corp. v. United States*, 63 F.3d 1572, 1580 (Fed.Cir.1995), held that 19 U.S.C. § 1677a does not preclude use of a tax-neutral adjustment methodology.[1] Subsequently, Commerce elected to return to a tax-neutral administration of 19 U.S.C. § 1677a(d)(1)(C). In addition, the Court agrees with Commerce that recalculations

---

**1.** Defendant-intervenors FAG Kugelfischer Georg Schaefer KGaA, FAG Cuscinetti SpA, FAG (UK) Ltd., Barden Corporation (UK) Ltd., FAG Bearings Corporation and The Barden Corporation (collectively, "FAG"), have motioned for modification of this Court's judgment in *Torrington*, 19

CIT at ——, 881 F.Supp. at 651, in accordance with the CAFC's opinion. FAG's Mot. to Modify J. and Issue Further Remand Order. While the Court declines to modify its prior judgment in this proceeding, the instant decision coincides with controlling precedent.

were unnecessary for (1) INA Roulements S.A. ("INA–France") because its margins were based on best information available, and (2) NMB Singapore Ltd. and Pelmec Industries (Pte.) Ltd. ("NMB/Pelmec Singapore") because VAT was not levied on sales of subject merchandise in Singapore. *See Remand Results* at 4. Therefore, the Court remands this case to Commerce to employ a tax-neutral methodology for the VAT adjustment to USP which utilizes the amount of the foreign market tax rather than the tax rate in recalculating the weighted-average dumping margins for all bearings for respondents subject to this remand, with the exception of those respondents for whom Commerce has determined that recalculation is unnecessary.

2. *FMV Adjustment For Pre–Sale Inland Freight*

In the underlying judicial review, the Court could not discern whether FMV was calculated using purchase price or exporter's sales price ("ESP"). Therefore, the Court instructed Commerce "to deny the adjustment to FMV for pre-sale home market transportation expenses only where FMV was calculated using purchase price." *Torrington*, 19 CIT at ——, 881 F.Supp. at 638. The Court's decision was in accordance with *Ad Hoc. Comm. of AZ–NM–TX–FL, Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 402 (Fed.Cir.1994) (in PP comparisons, Congress did not intend pre-sale HM transportation costs to be deducted from FMV), *cert. denied*, —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994).

In light of *Ad Hoc*, Commerce has changed its methodology and no longer deducts HM movement charges from FMV. *Remand Results* at 5. Instead, Commerce adjusts for those expenses under the COS provision, 19 C.F.R. § 353.56 (1992), and the ESP offset provision of 19 C.F.R. § 353.56(b)(1) and (2). *Id.*

When USP is based on PP, Commerce only adjusted for HM movement charges through the COS provision, capturing direct selling expenses, including post-sale movement expenses and, in some circumstances, pre-sale movement expenses. *Id.* Commerce treats pre-sale movement expenses as

direct expenses only if the expenses are directly related to the HM sales of the merchandise under consideration. *Id.* To discern the relationship of the expense to the sales under consideration, Commerce examines the respondent's pre-sale warehousing expenses because it views pre-sale movement charges incurred in positioning the merchandise at the warehouse as linked, analytically, to pre-sale warehousing expenses. *Id.* Commerce reasons that if pre-sale warehousing is an indirect expense, shipping similarly must be indirect. Conversely, a direct pre-sale warehousing expense implies a direct pre-sale movement expense. *Id. See Torrington Co. v. United States*, 18 CIT ——, ——, 866 F.Supp. 581, 584 (1994) (in a PP comparison, if the pre-sale warehousing expense is not shown to be a direct expense, it follows that the pre-sale freight expense is also not a direct expense), *aff'd*, 68 F.3d 1347 (Fed.Cir.1995). In most cases, Commerce deems pre-sale warehousing expenses to be indirect expenses. *Remand Results* at 5–6.

When USP is based on ESP, Commerce used the COS adjustment in the same manner as in purchase price situations.

Under the ESP offset provision, 19 C.F.R. § 353.56(b)(1) and (2), Commerce adjusted for any pre-sale movement charges found to be indirect selling expenses. *Id.*

Although in the Final Results, Commerce adjusted FMV for pre-sale inland freight expenses in PP and ESP sales comparisons, on remand Commerce adjusted FMV for these charges only to the extent allowable as indirect selling expenses for SKF USA Inc., SKF Industrie, S.p.A. ("SKF–Italy"), SKF GmbH ("SKF–Germany"), SKF France S.A. ("SKF–France"), SKF Sverige AB and SKF (U.K.) Limited ("SKF"), Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo"), FAG–Italy, Nachi–Fujikoshi Corp. ("Nachi"), NSK Ltd. and NSK Corporation ("NSK"), NTN, NMB/Pelmec Singapore, NMB Thai Ltd., Pelmec Thai Ltd. and NMB Corp. ("NMB/Pelmec Thai") under the commission and ESP offset provisions of 19 C.F.R. § 353.56(b). *Id.* at 6–7.

■ SKF raises an objection, asserting that its pre-sale inland freight expenses are

eligible for a COS adjustment. SKF's Comments on Remand Results at 6–11. The Court disagrees. First, the administrative record cited does not establish that SKF's warehousing expenses are directly related to the sales under consideration. *See* SKF's Comments on Remand Results at 6–7. *See also* Public R.Doc. No. 106, SKF's Section C Home Market Questionnaire Response at fields 34, 34.1; SKF's Section C Response for Germany, Confidential R., Doc. No. 41, Fr. 263A; Reel 10. The record indicates that freight expenses were incurred in transporting products sold to related companies *prior to the sale* of such products to unrelated customers in the home market.

■ In addition, SKF argues that its reported expenses are based on actual costs and are, therefore, directly tied to sales of the subject merchandise. SKF's Comments on Remand Results at 6–7. Under certain circumstances, allocated expenses may qualify for a COS adjustment. For example, *post-sale* expenses have been deemed tied to specific sales where "the apportionment of rebate cost was made on the basis of actual cost and sales figures." *Smith–Corona Group Consumer Prod. Div., SCM Corp. v. United States,* 713 F.2d 1568, 1580 (Fed.Cir. 1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). However, in this case, the expenses in question were incurred *prior* to the sale taking place. Expenses cannot be allocated across sales where no sale has yet taken place. Therefore, to the extent that these expenses were allocated, they cannot be deemed direct expenses. *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 19 CIT ——, ——, Slip Op. 95–91 at 5, 1995 WL 351035, *2 (May 15, 1995) (post-sales expenses will more likely be considered direct as actual sales can be identified once they exist). In addition, the pre-sale expenses which Commerce has treated as direct expenses "usually involve products channeled or customized for certain buyers." *Id.* SKF has presented no evidence that the freight expenses at issue here were incurred in the course of "channeling" or "positioning" sales for particular customers. SKF simply has not established that the pre-sale freight expenses qualify as direct expenses.

Finally, SKF argues that pre-sale inland freight expenses should be treated consistently for purposes of adjustments to USP and FMV. SKF's Comments on Remand Results at 6–12. The CAFC rejected this position in *Ad Hoc,* 13 F.3d at 401–02.

■ Moreover, this Court has approved Commerce's new methodology for treatment of home market pre-sale inland freight charges in PP and ESP transactions. *See Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 18 CIT ——, 865 F.Supp. 857 (1994) (purchase price transactions only), *aff'd per curiam,* 68 F.3d 487 (Fed.Cir.1995); *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 18 CIT ——, Slip Op. 94–152, 1994 WL 534945 (Sept. 26, 1994); *Torrington,* 18 CIT at ——, 866 F.Supp. at 583–84; *Torrington Co. v. United States,* 18 CIT ——, 866 F.Supp. 1434 (1994), *aff'd,* 68 F.3d 1347 (Fed.Cir.1995); *Federal–Mogul Corp. v. United States,* 18 CIT ——, 871 F.Supp. 443 (1994), *aff'd,* 82 F.3d 1039 (Fed.Cir.1996). Reaffirming those decisions, the Court sustains Commerce's methodology.

### 3. *Post–Sale Price Adjustments*

The Court instructed Commerce to develop a methodology which removes PSPAs and rebates on sales of out-of-scope merchandise in calculating adjustments to FMV and, ultimately, the dumping margins. If no viable method could be developed, Commerce was instructed to deny such an adjustment in calculating FMV. *Torrington,* 19 CIT at ——, 881 F.Supp. at 640.

In the Final Results, Commerce treated certain home market discounts, rebates and PSPAs that were not allocated upon a product-specific basis, but were allocated upon a customer-specific basis, as indirect selling expenses. *Final Results,* 57 Fed.Reg. at 28,-400–05. Commerce treated PSPAs as indirect selling expenses for Koyo, NSK, NTN, SKF–Germany and SKF–Italy. *Remand Results* at 7. In the Remand Results, Commerce modified its findings and treatment of PSPAs for these respondents.

Commerce explains upon remand that Koyo could not tie its reported PSPAs to the products on which they were granted and the extent to which the PSPAs pertained to out-of-scope merchandise could not be determined. Commerce was unable to develop a methodology which removed Koyo's PSPAs paid on sales of out-of-scope merchandise from any adjustment to FMV for PSPAs. Consequently, Commerce denied Koyo an adjustment for home market PSPAs in calculating FMV. *Id.* Koyo did not comment on this issue.

NSK had four rebate programs in effect for HM sales (REBATEH1–REBATEH4). In the Final Results, Commerce

> treated REBATEH1–H3 as direct expenses because they were either distributor/customer-specific and transaction-specific (REBATEH1 and H3), or distributor-specific, but granted as a straight percentage of all sales (REBATEH2). [Commerce] treated REBATEH4 (actually a PSPA) as an indirect expense in the final results of review because this PSPA was reported on a customer-specific basis but not granted as a straight percentage of sales.

*Id.* at 8. NSK also provided an Early Payment Discount (OTHDISH) which it allocated on a distributor-specific basis. The Final Results treated the OTHDISH as an indirect expense. *Id.*

■ On remand, Commerce affirmed its original treatment of REBATEH1–H3,[2] but disallowed REBATEH4 because the extent to which the PSPA was granted on sales of non-scope merchandise was unclear from the record. According to Commerce, the rebate was not traceable to specific part numbers. Commerce determined that NSK's allocation may not remove the effect of non-scope sales. *Id.* Commerce also disallowed NSK's Early Payment Discount because the extent to

which the amount of the OTHDISH was attributable to non-scope merchandise was unclear. Commerce explains that NSK calculated the discount percentage by dividing the total amount paid to a distributor by the total number of sales to that distributor. Commerce determined that the numerator and denominator may both have included non-scope merchandise. According to Commerce, NSK's distributor-specific allocation may not remove the effect of non-scope merchandise. *Id.*

NSK argues that Commerce misconstrued the Court's remand instructions and, as a result, incorrectly excluded REBATEH4 and the OTHDISH not only from FMV, but also from the ESP offset. NSK's Comments on Remand Results at 2. NSK maintains that under the law and the Court's remand, Commerce is authorized to adjust for indirect expenses not directly tied to sales of scope merchandise under the ESP offset. *Id.* at 2–3 (citing *Smith–Corona,* 713 F.2d at 1578; *Torrington Co. v. United States,* 19 CIT ——, 832 F.Supp. 365 (1993), *aff'd,* 68 F.3d 1347 (1995)).

NTN granted certain discounts (OTHDISH) on home market sales. On remand, Commerce denied NTN an adjustment to FMV for OTHDISH. Commerce explains that NTN did not differentiate between product-specific programs and those applicable also to non-scope merchandise. According to Commerce, the administrative record did not reveal the extent to which NTN's discounts were calculated using non-scope merchandise and suggested that the discounts varied in amount and were not granted on all sales. Remand Results at 9.

Finally, SKF–Germany and SKF–Italy granted post-sale billing adjustments for their customers but did not record them on a transaction-specific basis. *Remand Results* at 7. According to Commerce, these PSPAs

---

**2.** Torrington objects to Commerce's treatment of REBATEH2 as a direct expense claiming that, in a subsequent proceeding, Commerce found that REBATEH2 did not demonstrably exclude rebates on non-scope merchandise. Torrington challenges NSK's methodology because it adds all of the incentives paid to distributors and divides that number by total sales to that distributor. Torrington's Comments on Remand Re-

sults at 8. The Court concludes, however, that the distributor-specific methodology at issue is acceptable because the incentives were "granted as a straight percentage of all sales." *Remand Results* at 8. *See also Torrington Co. v. United States,* 17 CIT 922, 935, 832 F.Supp. 379 (1993) (customer-specific allocation acceptable when the percentage amount is the same across products).

were reported in a manner which did not permit removal of the effects of non-scope merchandise. On remand, Commerce denied any adjustment because it could not selectively evaluate the effect of the PSPAs on the margin. *Id.* at 19–21.

SKF objects to Commerce's denial of an adjustment for indirect expenses. First, SKF argues that Commerce never requested segregation of scope and non-scope merchandise concerning billing adjustments. SKF's Rebuttal Comments on Remand Results at 12–13. Second, SKF contends that SKF–Germany's (1) customer-specific allocations reflect expenses which were incurred in equal proportions on scope and non-scope merchandise, and (2) reporting was not distortive and was verified by Commerce as being based on actual expenses/revenues. *Id.* at 13–14. To support adjustments based on indirect expenses, SKF cites *SKF USA Inc. v. United States*, 19 CIT ——, 874 F.Supp. 1395 (1995); *SKF USA Inc. v. United States*, 19 CIT ——, 875 F.Supp. 847 (1995); and *Torrington Co. v. United States*, 17 CIT 922, 935–36, 832 F.Supp. 379, 390 (1993), *aff'd*, 68 F.3d 1347 (1995). *Id.*

According to Torrington, Commerce should have selectively granted a PSPA adjustment to SKF–Germany and SKF–France when it resulted in an addition to FMV. Torrington's Comments on Remand Results at 6–7.

In various other cases, as in this case, the Court has stated that Commerce cannot use non-scope merchandise to assess antidumping duties. 19 U.S.C. § 1675(a)(2) (1988). *See, e.g., Torrington Co. v. United States*, 17 CIT 199, 218, 818 F.Supp. 1563, 1578–79 (1993), *aff'd*, 82 F.3d 1039 (Fed.Cir.1996); *Torrington*, 19 CIT at ——, 881 F.Supp. at 640. In light of its concern over the use of non-scope merchandise, the Court remanded this case. Since the Court's remand, the CAFC has ruled on this issue. *Torrington Co. v. United States*, 82 F.3d 1039 (Fed.Cir. 1996). In *Torrington*, Koyo's PSPAs were adjustments to the price of a product or group of products. They were made "in response to billing errors for a particular customer or in response to the post-sale raising or lowering of the price for a particular customer." The PSPAs "were reported ... on a customer-specific basis because data is not recorded and maintained in Koyo Seiko's computerized records on a product-specific basis." *Id.* at 1050–51. Commerce had allowed an adjustment for indirect expenses. Concluding that Commerce had unlawfully allowed PSPAs to be calculated using out-of-scope merchandise, this Court rejected the adjustment. *Torrington*, 17 CIT at 218, 818 F.Supp. at 1578–79. Affirming this Court's decision, the CAFC held that, in situations involving allocations over scope and non-scope merchandise, the focus must be on the PSPAs calculation method, not the recordation or the allocation method. *See Torrington*, 82 F.3d at 1048–49. The Court analyze's Commerce's treatment of each respondent's PSPAs in turn in light of the CAFC decision.

■ Koyo's PSPAs are "revisions or corrections to prices." Koyo "made post-sale price adjustments on an annual or semi-annual basis based on considerations which crossed individual sales and product lines." *Final Results*, 57 Fed.Reg. at 28,400. The situation presented here is identical to that in *Torrington* where the CAFC refused to allow Koyo's direct selling expenses to be treated as indirect selling expenses pursuant to the ESP offset regulation. *Torrington*, 82 F.3d at 1048–49. Neither the recordation nor the allocation of PSPAs alters the relationship between a given expense and the sale to which it relates. *Id.* at 1048. Thus, it is the relationship of the expense to the sales under consideration which is of import. In this case, Koyo's PSPAs which relate to particular sales, could not be reported by Koyo on a product-specific basis because of the method of recordkeeping. Koyo's PSPAs were not tied to the product sold and Commerce could not treat them as direct expenses. The allocation method did not deprive the expenses of their direct relationship to the sales under consideration. Therefore, the PSPAs could not be treated as indirect selling expenses under the ESP offset provision. Accordingly, no adjustment could be granted. The Court finds, therefore, that Commerce correctly denied Koyo an adjustment to FMV for its PSPAs.

Similarly, post-sale billing adjustments for SKF–Germany and SKF–Italy which related to specific transactions were not recorded on a transaction-specific basis, but in a single account. Thus, the adjustments could not be tied to the product sold. Further, the billing adjustments varied in amount and, exactly as in *Torrington*, 82 F.3d 1039, with respect to whether they were additions to, or subtractions from, price. *See* Remand Results at 7.[3] NSK's REBATEH4 also could not be traced to specific part numbers but only to specific customers. The allocation for its OTHDISH only took the total amount paid to a distributor and divided this amount by total sales to that distributor. *Id.* at 8. NTN also seeks an adjustment to FMV for its OTHDISH. However, it did not differentiate between product-specific programs and those applicable to non-scope merchandise. Therefore, its discounts could not be tied to the merchandise sold. Further, the administrative record suggested to Commerce that the discounts NTN granted also varied in amount and were not granted on all sales. Remand Results at 9.

In light of the Court's discussion of the CAFC's decision in *Torrington* and this Court's reasoning with respect to Koyo, the Court finds that Commerce properly denied an adjustment to FMV in every instance challenged here. Accordingly, the Court sustains Commerce's denial of an adjustment to FMV to Koyo for its PSPAs, to SKF–Germany and SKF–Italy for their post-sale billing adjustments, to NSK for REBATEH4 and its OTHDISH, and to NTN for its OTHDISH. In addition, the Court affirms Commerce's decision with regard to REBATEH1–H3 for NSK.

### 4. *FAG–Italy's Related Party Transfer Prices*

In making its constructed value calculation, Commerce is required to include an amount for profit. 19 U.S.C. § 1677b(e)(1)(B). The profit amount included in CV may not be less than eight percent of the sum of cost of materials and general expenses. *Id.* § 1677b(e)(1)(B)(ii). *See also Torrington*, 19 CIT at ——, 881 F.Supp. at 643; *Aramide Maatschappij V.o.F. v. United States*, 19 CIT ——, ——, 901 F.Supp. 353, 356 (1995). In *Torrington*, 19 CIT at ——, 881 F.Supp. at 643, the Court found that the profit calculation applies also in the case of inputs which are purchased from a related supplier and directed Commerce to add a minimum of eight percent profit in calculating CV for FAG–Italy. This instruction was consistent with the Court's opinion in *SKF USA Inc. v. United States*, 19 CIT ——, 885 F.Supp. 274 (1995).

As required by statute, Commerce is "ensuring that a minimum profit of eight percent is added to CV" for FAG–Italy. No changes to its original calculations were necessary. *Remand Results* at 9. Commerce correctly explains that the CV calculation for FAG–Italy conforms to the Court's instruction and *SKF*, 19 CIT at ——, 885 F.Supp. at 279. Accordingly, the Court sustains Commerce's treatment of profit in the calculation of CV for FAG–Italy.

### 5. *NTN's Inventory Carrying Cost Adjustment*

In the underlying case, Torrington challenged Commerce's grant of adjustments to FMV for inventory carrying cost for NTN. Torrington claimed that NTN's inclusion of amounts for work in process, raw materials and supplies inflated the adjustment which, under recent Commerce practice, had been limited to finished goods inventory. Commerce inadvertently neglected to address Torrington's argument in the Final Results. Torrington and Commerce both requested that this issue be remanded. *Torrington*, 19 CIT at ——, 881 F.Supp. at 643–44. The Court remanded this case for Commerce to address the issue raised by Torrington and to set forth the basis for its determination in the Final Results. *Id.* at ——, 881 F.Supp. at 644.

In the 1991–92 review, Commerce stated: Inventory carrying costs are designed to measure the cost to a company of holding

---

**3.** SKF's argument that Commerce did not request the necessary information was made previously to this Court and rejected. SKF's Opp'n to Torrington's Mot. for J. upon the Administrative R. at 110 n. 212 (June 29, 1993).

merchandise that could be sold to generate revenue. Because raw materials and work in process are, by definition, not yet salable merchandise, the Department bases inventory carrying cost on the value of finished goods only. Therefore, we have recalculated NTN's claimed HM inventory carrying cost to eliminate that portion related to raw materials and work in process.

*Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order,* 58 Fed.Reg. 39,729, 39,745 (July 26, 1993). Commerce now agrees with Torrington and has conformed its treatment of inventory carrying costs for NTN with the 1991–92 review, "recalculat[ing] NTN's claimed HM inventory carrying cost to eliminate that portion related to raw materials and work in process." *Remand Results* at 10. The Court sustains Commerce's recalculation of NTN's claimed HM inventory carrying costs as reasonable.

### 6. Treatment of NMB Thailand's "Route B" Sales

█ In the original LTFV investigation, Commerce found that NMB Thai Ltd. and Pelmec Thai Ltd. ("NMB/Pelmec Thailand" or "NMB") sold ball bearings at a transfer price to Minebea Co. Ltd., Singapore branch ("MSB"), which in turn sold the bearings to an unrelated customer in Singapore. These sales were referred to as "Route B" sales. The Singaporean customer, in turn, sold the bearings to its related affiliate in Thailand at a transfer price. Commerce focused on the first transaction, the one occurring between MSB and the unrelated customer in Singapore. Commerce reasoned that because the merchandise was exported to Singapore from Thailand and the first sale to an unrelated party took place in Singapore, the merchandise entered the Singaporean commerce. Based largely on the first sale to the unrelated Singaporean customer, Commerce determined that the "Route B" sales were third country sales. *Final Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed.Reg. 18,992, 19,025 (1989); *Final Determination of Sales*

*at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand,* 54 Fed.Reg. 19,117, 19,118–19 (May 3, 1989); *Remand Results* at 11–12.

During this administrative review, Commerce determined that NMB's "Route B" sales are HM sales. Torrington challenged the disparate treatment afforded "Route B" sales in the LTFV investigation and in this review and the Court directed Commerce to provide a reasonable explanation for the inconsistency or to exclude the "Route B" sales in question here from the home market database. *Torrington,* 19 CIT at ——, 881 F.Supp. at 648.

Commerce represents that important facts distinguishing the "Route B" sales in this case from those involved in the LTFV investigation qualify the current "Route B" sales as HM sales. First, Commerce argues that the sales involved in this review were transacted in Thailand whereas the LTFV "Route B" sales took place in Singapore. Second, Commerce argues that the bearings involved in this review were consumed in Thailand whereas the LTFV "Route B" bearings were first consumed in Singapore. Def.'s R. to Comments on Remand Results at 19–20. Commerce notes that, although the LTFV investigation did not focus on this factor, 19 U.S.C. § 1677b(a)(1)(A) requires that the merchandise be sold or, in the absence of sales, offered for sale in the principal markets of the exporting country in the usual commercial quantities in the ordinary course of trade for *home consumption.* Commerce contends that NMB's long-standing sales practice supports the position that its "Route B" sales are "ordinary course of trade" sales. *Id.* at 20–21.

Torrington avers that the only factor which distinguishes the sales at issue here and the LTFV "Route B" sales is that, in the LTFV case, one or more Route B customers conducted their sales transactions in Singapore, while in the case at bar, all transactions were conducted in Thailand. According to Torrington, the location of the transaction should be irrelevant for purposes of classifying transactions as ordinary course HM sales. Torrington maintains that the transfer to MSB rendered the "Route B" sales at issue

here atypical because NMB/Pelmec does not set the "Route B" prices and has no actual knowledge of the bearings' destination. Torrington's Comments on Remand Results at 10–16.

Torrington's arguments fail because the crux of this issue lies in the relevant statutory and regulatory definitions. For purposes of United States and home market price comparisons, the statute refers to merchandise which "is *sold* or, in the absence of sales, offered for sale *in the principal markets of the country from which exported*, in the usual commercial quantities and *in the ordinary course of trade for home consumption.*" 19 U.S.C. § 1677b(a)(1)(A) (emphasis added); *Remand Results* at 19. Commerce determines whether home market sales are in the ordinary course of trade by considering the conditions and practices which, for a reasonable period prior to the time of exportation of the subject merchandise, have been normal in the trade of merchandise of the same class or kind as that under consideration. 19 U.S.C. § 1677(15) (1988); 19 C.F.R. § 353.46(b) (1992).

First, Commerce's posture that the location of the sale transaction has a significant bearing on how a sale is classified is correct. This Court has interpreted the language "the principal markets of the country from which exported" as referring to the *home market. See Torrington Co. v. United States*, 15 CIT 605, 607, 779 F.Supp. 1395, 1397 (1991). *See also* 19 C.F.R. § 353.46 (using the language "in the principal markets of the *home market country* ") (emphasis added). It is uncontroverted that the sale involved in the second administrative review were transacted in Thailand while the sale involved in the original investigation took place in Singapore. As the bearings at issue in this review were sold in Thailand, the home market, they cannot be third country sales.

Second, Torrington has provided no evidence that the sales in question here are not "ordinary course of trade" sales. In this respect, this case resembles *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573 (Fed. Cir.1993), where the appellate court stated that this court correctly upheld Commerce's determination that Fujitsu sales were in the "ordinary course of trade." The record in that case reflected that, for a number of years, Fujitsu had routinely sold a substantial percentage of its televisions to farmer's cooperatives. No evidence was produced showing that the sales did not fit the statutory and regulatory definition of ordinary course of trade sales. *Id.* at 1583. Similarly, Torrington has produced no evidence showing that the "Route B" sales in question are unusual or extraordinary.

In addition, the goods at issue here, admittedly, were consumed in Thailand.

In the Remand Results, Commerce stated: [T]he first unrelated sale in this review for all "route B" sales occurred in Thailand. This differs from the original LTFV investigation where the first unrelated sales for one customer, which NMB Thailand classified as "route B" sales occurred in Singapore.... [T]hose sales were third country sales, not HM sales.... [T]he fact that we chose not to verify NMB Thailand's response for this review is not a factor in determining whether the sales qualify as legitimate HM sales.... [W]e recognize that HM sales can have different tax or duty treatments based on the particular circumstances of the sales. However, as the Court pointed out, the fact that import duties on raw materials and machinery may not have been paid on bonded warehouse sales has no bearing as to whether the bonded warehouse sales were made in the ordinary course of trade. *See Torrington*, Slip Op. 95–54, at 62. In other words, the fact that sales through "route B" received different tax treatment than sales through "route A" is irrelevant to the determination of whether the sales are made "in the ordinary course of trade." Finally, notwithstanding the fact that these sales may have earned export subsidies due to the marketing channels in which they passed, or have been subject to different legal considerations or statistical treatment by the Thai government, the overriding factor is whether the merchandise "is sold, or in the absence of sales, offered for sale in the principal markets of the country from which exported in the usual commercial quantities and in the ordinary

course of trade for *home consumption* ...*" pursuant to Section 773(a)(1)(A) of the Tariff Act of 1930, as amended (emphasis added).

Since the bearings in question are consumed in the HM, they are undeniably HM sales of bearings. Also, the factors cited by Torrington do not render these sales outside the ordinary course of trade.

*Remand Results* at 24–25.

Commerce's explanation for classifying NMB's "Route B" sales as HM sales is reasonable and its determination is supported by law and the record. Accordingly, the Court sustains Commerce's inclusion of NMB's "Route B" sales in the HM database.

## Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to apply the tax-neutral value added tax methodology approved by the Federal Circuit in *Federal–Mogul,* 63 F.3d at 1572, and to recalculate the dumping margins accordingly for respondents subject to this remand, excluding those respondents for whom recalculation is unnecessary. Commerce's Remand Results are affirmed in all other respects.

This Court, having received and reviewed the Department of Commerce, International Trade Administration's ("Commerce") final results of redetermination on remand filed pursuant to *Torrington Co. v. United States,* 19 CIT ——, 881 F.Supp. 622 (1995) (*"Remand Results"*), and responses to the Remand Results submitted by the parties, it is

**ORDERED** that this case is further remanded to Commerce to apply the tax-neutral value added tax methodology approved by the United States Court of Appeals for the Federal Circuit in *Federal–Mogul Corp. v. United States,* 63 F.3d 1572 (Fed.Cir.1995), and to recalculate the dumping margins for respondents subject to this remand with the exception of those for whom Commerce has determined recalculation is unnecessary; and it is further

**ORDERED** that Commerce's Remand Results filed on August 14, 1995 are affirmed in all other respects; and it is further

**ORDERED** that the remand results are due within thirty (30) days from the date this opinion is entered. Comments or responses by the parties are due within fifteen (15) days thereafter. Rebuttal comments are due within ten (10) days of the date responses or comments are due.