INA WALZLAGER SCHAEFFLER KG and INA Bearing Company, Inc.; FAG Kugelfischer Georg Schäfer AG and FAG Bearings Corporation; SKF USA Inc. and SKF GmbH, Plaintiffs and Defendant–Intervenors,

v.

The UNITED STATES, Defendant,

The Torrington Company, Defendant–Intervenor and Plaintiff,

NTN Bearing Corporation of America and NTN Kugellagerfabrik (Deutschland): GmbH, Defendant–Intervenors.

Slip Op. 97–12.
Court No. 95–03–00318.

United States Court of International Trade.

Feb. 3, 1997.

254

Arent Fox Kintner Plotkin & Kahn, Washington, DC (Stephen L. Gibson and Peter L. Sultan), for plaintiff and defendant-intervenor INA.

Grunfeld, Desiderio, Lebowitz & Silverman, L.L.P., New York City (Max F. Schutz-

man, Andrew B. Schroth and Mark E. Pardo), for plaintiff and defendant-intervenor FAG.

Howrey & Simon, Washington, DC (Herbert C. Shelley, Alice A. Kipel, Anne Talbot and Patricia M. Steele), for plaintiff and defendant-intervenor SKF.

Stewart and Stewart, Washington, DC (Terence P. Stewart, Wesley K. Caine, William A. Fennell, Geert De Prest and Lane S. Hurewitz), for plaintiff and defendant-intervenor Torrington.

Barnes, Richardson & Colburn, Chicago, IL (Donald J. Unger and Kazumune V. Kano), for defendant-intervenor NTN Bearing Corporation of America and NTN Kugellagerfabrik (Deutschland) GmbH.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis); of counsel: Mark A. Barnett, Michelle K. Behaylo, Stacy J. Ettinger, Thomas H. Fine, Dean A. Pinkert and David J. Ross, Attorney–Advisors, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC, for defendant.

### *OPINION*

TSOUCALAS, Senior Judge:

Plaintiffs and defendant-intervenors INA Walzlager Schaeffler KG and INA Bearing Company, Inc. (collectively "INA"), FAG Kugelfischer Georg Schäfer AG and FAG Bearings Corporation (collectively "FAG"), and SKF USA Inc. and SKF GmbH (collectively "SKF") move this Court pursuant to Rule 56.2 of the Rules of this Court challenging certain aspects of the final determination of the fourth administrative review of antifriction bearings ("AFBs") from Germany, entitled *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders ("Final Results")*, 60 Fed. Reg. 10,900 (1995), as amended, *Antifriction Bearings (Other Than Tapered Roller Bear-*

*ings) and Parts Thereof From Japan and Germany; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 60 Fed.Reg. 10,967 (1995), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; Amendment to Final Results of Antidumping Duty Administrative Reviews and Recision of Partial Revocation of Antidumping Duty Order*, 60 Fed.Reg. 16,608 (1995). The Torrington Company ("Torrington") also challenges the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") fourth administrative review of AFBs from Germany.

### *Background*

On May 15, 1989, Commerce published the antidumping duty orders on AFBs from Germany. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany ("Antidumping Duty Orders")*, 54 Fed.Reg. 20,900 (1989). The fourth administrative review encompasses imports of AFBs entered during the period of May 1, 1992 through April 30, 1993. *See Final Results*, 60 Fed. Reg. at 10,900. The present consolidated action concerns imports from Germany.

On February 28, 1994, Commerce published the preliminary results of the fourth administrative review. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, Thailand, and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Notice of Intent To Revoke Orders (in Part)*, 59 Fed.Reg. 9,463 (1994). On February 28, 1995, Commerce published the Final Results at issue. *See Final Results*, 60 Fed.Reg. at 10,900.

INA, FAG and SKF raise the following issues regarding Commerce's actions: (1) recalculation of constructed value profit for INA's cylindrical roller bearings ("CRBs"); (2) inclusion of certain needle roller bearings in the review based on application of a 4 to 1 ratio test; (3) use of a rate rather than an amount methodology to compute the value-added tax ("VAT") adjustment; (4) inclusion

of FAG's sample and prototype sales to U.S. customers in the margin calculation; (5) application of an assessment rate methodology which divided potential uncollected dumping duties by total entered value of reviewed sales; (6) exclusion of certain home market sales of FAG from the margin calculations; (7) treatment of certain home market expenses of FAG as indirect expenses; (8) denial of adjustment for SKF's rebates, cash discounts and billing adjustments.[1]

Plaintiff and defendant-intervenor, The Torrington Company ("Torrington"), claims that Commerce erred in: (1) failing to apply the reimbursement regulation; (2) considering below-cost sales in its calculation of profit for constructed value; (3) resorting to constructed value without considering other home market sales of similar models; (4) adjusting foreign market value ("FMV") for presale inland freight; (5) failing to adjust U.S. price ("USP") accurately for ocean/air freight expenses; (6) refusing to allocate a portion of INA's advertising expenses, incurred in the home market for domestic and export sales, to U.S. export sales; (7) failing to allocate INA's indirect selling expenses, incurred for home market and export sales, to U.S. exports; and (8) committing a clerical error.

### Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

■ The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to

weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### 1. Calculation of INA's Profit for Constructed Value

In the Final Results at issue, Commerce recalculated INA's profit to compute constructed value for CRBs. 60 Fed.Reg. at 10,922. Commerce conducted an "arm's-length" test on sales and a "variance" test on profit before deciding to recompute INA's profit. Commerce explained its methodology as follows:

Section 773(e)(2) of the Tariff Act provides that a transaction between related parties may be "disregarded if, in the case of an element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration." The arm's-length test, which is conducted on a class or kind basis, determines whether sales prices to related parties are equal to or higher than sales prices to unrelated parties in the same market. This test, therefore, is not dispositive of whether *the element of profit* on related party sales is somehow not reflective of the amount usually reflected in sales of the merchandise under consideration. However, related-party sales that fail the arm's-length test do give rise to the possibility that certain elements of value, such as profit, may not fairly reflect an amount usually reflected in sales of the merchandise. We considered whether the amount for *profit* on sales to related parties was reflective of an amount for profit usually reflected on sales of the merchandise. To do so, we compared profit on sales to related parties that failed the arm's-length test to profit on sales to unrelated parties. If the profit on sales to related parties varied significantly from the profit on sales to unrelated parties, we

---

**1.** In the interest of efficiency, the Court has listed all of the issues raised by INA, FAG and SKF without differentiating among issues raised by each party. The Court will address the issues and parties more specifically in the discussion.

disregarded related-party sales for the purposes of calculating profit for CV [constructed value].

We first calculated profit on sales to unrelated parties on a class or kind basis. If the profit on these sales was less than the statutory minimum of eight percent, we used the eight percent statutory minimum in the calculation of CV. If the profit on these sales was equal to or greater than the eight percent statutory minimum, we calculated profit on the sales to related parties that failed the arm's-length test and compared it to the profit on sales to unrelated parties as described above. Based on this methodology, we found only one instance in which the profit on sales to unrelated parties was greater than eight percent-specifically, sales of CRBs by INA.

Profit on INA's sales of CRBs to unrelated parties varied significantly in comparison to profit on its sales of CRBs to related parties. Therefore, we conclude that the profit on INA's sales to related parties did not fairly reflect the amount usually reflected on HM [home market] sales of this merchandise. Accordingly, we used INA's profit on sales to unrelated parties in the calculation of profit in determining CV for CRBs.

*Id.*

INA objects to this recalculation, arguing it was unnecessary and contrary to law. First, INA contends Commerce erred in its application of the variance test by failing to take into account the direction of the variance. INA emphasizes that the variance test indicated that the profit on sales to related parties was more than the profit earned on sales to unrelated parties. According to INA, a respondent company benefits from the inclusion of related party profit in the profit calculation only if the profit on sales to related parties is less than the profit on sales to unrelated parties. INA alleges that its position is supported by the following paragraph contained in an order issued by this Court, entitled *Fag Kugelfischer Georg Schäfer Ag v. United States,* Slip Op. 95–81, at 1–2, 1995 WL 283834 (May 4, 1995):

For FAG Germany, calculate a profit on sales to related parties that failed the arm's-length test and compare this profit to the profit on sales to unrelated parties; where profit on related party sales is not significantly *less* than profit on unrelated party sales, Commerce is directed to base profit on all sales of the same *class or kind* (including related party sales) as reported by FAG Germany on the record.

INA's Mem.Supp.Mot.J. Agency R. at 10–11.

INA also opposes Commerce's calculation of profit on the basis of such or similar merchandise. In support of its position, INA asserts that 19 U.S.C. § 1677b(e) (1988) requires the amount for profit in constructed value to be equal to the amount usually reflected in the producer's home market sales of merchandise of the same general class and kind as the merchandise under consideration. INA maintains home market sales of such or similar merchandise are not representative of home market sales of the entire class or kind of merchandise, because the selection of such or similar merchandise is based on the pattern of sales to the United States rather than on the pattern of sales in the home market. *Id.* at 12–14.

INA further contends there was no justification for Commerce's decision to depart from the use of INA's general class or kind profit calculation because the related party sales constituted only a "minuscule portion" of INA's home market sales. *Id.* at 15. In addition, INA argues, if Commerce needed to resort to other information, it should have relied on the general class or kind profit calculation submitted by INA because the inclusion of related party sales would have actually had an adverse affect on INA. *Id.*

INA also insists Commerce's arm's-length test did not support the application of the variance test. INA points out that the average prices on INA's CRB sales to unrelated parties were predominately lower than the average prices to related parties. *Id.* at 16–17.

Finally, INA asserts that Commerce made two computation errors resulting in the overstatement of profit. The errors, according to INA, were due to Commerce's failure to consider the differences between COP for sales and COP for constructed value. The first

alleged error was Commerce's failure to deduct imputed interest in determining the overall profit amount. The second claimed error was Commerce's failure to adjust for the difference between the two definitions of COP in applying the profit rate. Thus, INA suggests that if the Court does not find Commerce's profit recalculation to be unlawful, it should still remand this case to Commerce to correct the calculation errors. *Id.* at 17–19.

Commerce advances several arguments in defense of its decision to recalculate INA's profits. First, Commerce responds that regardless of whether the variance was higher or lower, the variance test reflected that the amount of profit on related party sales was still not the same as the amount usually reflected in non-related party sales. According to Commerce, the variance in the amounts of profit tainted the profit calculated by INA for the class or kind of merchandise. Commerce argues that because the profit calculations submitted by INA were tainted, Commerce properly relied on home market sales of such or similar merchandise as the best alternative evidence pursuant to 19 U.S.C. § 1677b(e)(2). Def.'s Partial Opp'n to Mots. J. Agency R. at 61–64.

Commerce also defends its determination that related party sales failed the arm's-length test. Commerce explains that pursuant to its arm's-length test, in addition to examining the number and value of sales transactions, Commerce considers the volume or quantity of goods sold. Commerce claims it found that the total dollar volume of CRBs sold by INA to related parties in three of the 17 sales comparisons in which prices to related parties were lower than prices to unrelated parties, was considerably greater than the combined total dollar volume of all 14 sales transactions to related parties in which prices were higher than prices to unrelated parties. As such, Commerce states it properly concluded that INA's related party sales failed the arm's-length test. *Id.* at 64.

Finally, Commerce addresses the two computation errors alleged by INA. Regarding Commerce's failure to deduct imputed interest, Commerce argues that INA's proposed deduction would not yield an accurate calculation of INA's profit, which is the difference between actual revenues and actual expenses. As for the second error, Commerce requests a remand to reconsider the manner in which it adjusted for the differences between sales COP and constructed value COP in applying the profit rate. *Id.* at 65.

Torrington supports Commerce's decision to recalculate INA's profit for constructed value transactions. Torrington emphasizes that 19 U.S.C. § 1677b(e)(2) grants Commerce broad authority to disregard information based in part on data concerning sales to related parties. Torrington's Opp'n to Mots. J. Agency R. at 52–57.

In rebuttal, INA disputes Commerce's conclusion that the total dollar volume in the three referenced comparisons was greater than the total dollar volume in the other 14 comparisons. INA's Reply to Opp'n to Mots. J. Agency R. at 3–4.

As a preliminary matter, contrary to INA's assertion, this case is not decided by the *FAG Kugelfischer* order. That order was issued pursuant to a consent motion for expedited remand to correct ministerial errors. Based on that order, the Court cannot conclude whether the facts of that case were similar to the ones at bar. A statement in an order pursuant to a consent motion cannot support the Court's decision of law.

In computing constructed value, the statute states that the calculation shall include "an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration . . . ." 19 U.S.C. § 1677b(e)(1)(B). Section 1677b(e)(2), Title 19, United States Code, further instructs Commerce that for purposes of computing constructed value

> a transaction directly or indirectly between [related parties] may be disregarded if, in the case of any element of value required to be considered, *the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise under consideration.* If a transaction is disregarded under the preceding sentence and there are no other transactions

available for consideration, then the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between [non-related parties].

(Emphasis added).

The statute grants Commerce the authority to disregard related party sales if any element of that sale "does not fairly reflect the amount usually reflected in sales in the market under consideration." *Id.* In this case, Commerce found that the profit amount for related party sales did not fairly reflect the amount of profit usually reflected in non-related party sales of the same merchandise. Commerce reached this finding by applying both its arm's-length and variance tests.

 INA's criticism of the arm's-length test is meritless. While it is true that the prices to related parties were lower than those to non-related parties in only three of the 17 types of transactions compared, the record supports Commerce's claim that in those three instances, the volume of sales to related parties was greater than the combined volume of the other 14 transactions. *See* Analysis of Commerce Arm's–Length Test Data, INA's App., Ex. 3. INA focuses on the dollar volume arguing that it was less for the three sales at issue than for the other 14 sales. *See* INA's Reply to Opp'n to Mots. J. Agency R. at 3–4. However, this argument does not contravene Commerce's finding that the sales at issue failed the arm's-length test. The arm's-length test is used to determine whether sales prices to related parties are equal or higher to sales prices to unrelated parties in the same market. *See Final Results,* 60 Fed.Reg. at 10,922. If the related party sales prices are lower than unrelated party sales prices, the related party sales fail the arm's-length test. *See id.* Applying this test, Commerce found that there was a sufficient volume of related party sales that were sold at prices below those of unrelated party sales to justify its conclusion that related party sales failed the arm's-length test. The record supports this finding. *See* Analysis of Commerce Arm's–Length Test Data, INA's App., Ex. 3.

 Based on Commerce's determination that the related party sales failed the arm's-length test, Commerce applied the variance test to determine whether an element of value, profit, of related party sales was fairly reflective of the value of profit of unrelated sales. INA does not dispute the existence of a significant profit variance, but argues that the direction of the variance undermined Commerce's findings. However, the statute does not specify that the profit for related party sales must be lower than that for unrelated party sales in order for Commerce to disregard the related party sales. Regardless of the direction of the variance, a significant variance means that the profit earned on related party sales was not fairly reflective of the profit earned on unrelated party sales. Therefore, Commerce properly resorted to best evidence available. *See* 19 U.S.C. § 1677b(e)(2).

 In addition, INA's contention concerning Commerce's selection of home market sales to unrelated parties as best evidence available is illogical. INA would have Commerce use the very information Commerce rejected as unrepresentative of the sales under consideration as best evidence available. Once Commerce determined that INA's profit calculation included unrepresentative sales, it was proper for Commerce to look to other information. The use of INA's home market profit for such or similar merchandise did not constitute adverse best information. Commerce relied on INA's own reported information for transactions that were as similar as possible to the transactions under investigation. The fact that Commerce generally does not believe that the "profit on the sales of such or similar merchandise can be presumed to be representative of the profit for the general class or kind of merchandise," does not mean that Commerce cannot use the profit on the sales of such or similar merchandise as best evidence available. *See Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order,* 58 Fed.Reg. 39,729, 39,752 (1993). Commerce has decided not to rely on a presumption that elements of sales of such or similar merchandise are representative of elements of a general class or kind of merchan-

dise. *See id.* However, there is nothing in the statute that prevents Commerce from relying on sales of such or similar merchandise as best evidence available when Commerce finds that reported transactions do not fairly reflect the value of the transactions being considered. The Court concludes that Commerce's decision to disregard the reported profit in favor of best evidence available was supported by substantial evidence on the agency record.

█ The Court finds a remand is necessary for Commerce to address the two computation errors. Commerce's position on these errors is inconsistent. On the one hand, Commerce acknowledges the differences between sales COP and constructed COP and requests a remand to adjust for the differences. However, Commerce states that it should not be required to deduct imputed interest in determining the overall profit value for constructed COP. One of the differences between sales COP and constructed COP is that constructed COP includes imputed interest. Thus, in considering the differences between sales COP and constructed COP, Commerce must make the appropriate imputed interest adjustment. This case is remanded to Commerce to deduct the imputed interest for credit expenses and inventory carrying costs from constructed COP and to adjust for the differences between sales COP and constructed COP in applying the profit rate.

2. *Inclusion of Needle Roller Bearings*

On December 23, 1991, Commerce made a determination in response to a scope ruling request submitted by FAG concerning certain needle bearings, holding that for purposes of the AFBs antidumping order, needle roller bearings with a length-to-diameter ratio of 4 to 1 or less were considered CRBs. On September 2, 1992, Commerce sent a letter to FAG and other interested parties clarifying that the ratio of 4 to 1 is a dispositive ratio and the standard to be applied in all circumstances for distinguishing between needle roller bearings and CRBs. As a result of the above decision, Commerce included within the scope of the determination at issue CRBs with a length-to-diameter ratio of

4 to 1 or less. *Final Results,* 60 Fed.Reg. at 10,957.

a. *INA*

INA contests Commerce's classification of AFBs with a length-to-diameter ratio of less than 4 to 1 as CRBs within the scope of the order. INA's Mem.Supp.Mot.J. Agency R. at 19–21. As Commerce points out, and as INA acknowledges in its reply brief, this issue was decided by the Court in *INA Walzlager Schaeffler KG v. United States,* Slip Op. 96–23, 1996 WL 19298 (Jan. 19, 1996), *appeal docketed,* No. 96–1256 (Fed.Cir. Mar. 18, 1996). In *INA Walzlager,* the Court upheld Commerce's classification of AFBs having a length-to-diameter ratio of less than 4 to 1 as CRBs within the scope of the Antidumping Duty Orders on CRBs from Germany. The Court adheres to its decision and sustains Commerce on this issue.

b. *FAG*

█ FAG also objects to the inclusion of CRBs, but for different reasons. FAG does not contest the substantive finding of Commerce's scope ruling but, rather, argues Commerce should not have applied the scope ruling retroactively. FAG insists that at the time of review, it could not have known that Commerce would apply the findings of its December of 1991 scope determination to all period of review sales of needle bearings with length-to-diameter ratios of 4 to 1. FAG's Mem.Supp.Mot.J. Agency R. at 26–29.

Commerce counters it did not change the scope of the outstanding order on CRBs, but merely clarified that the CRBs at issue had always been within the scope of the order. Def.'s Partial Opp'n to Mots. J. Agency R. at 40–45.

The Court addressed this issue in the case involving the third period of review. *See FAG Kugelfischer Georg Schafer KGaA v. United States,* 20 CIT ——, ——–——, 932 F.Supp. 315, 319–20 (1996). In that case, the Court held that the scope ruling did not change the parameters of the antidumping duty order on AFBs and, therefore, the bearings at issue were always included within the scope of the order. 20 CIT at ——, 932

F.Supp. at 320. In the previous case, FAG's argument was even stronger because FAG had already submitted its questionnaire response at the time of Commerce's clarification of the scope ruling. In the present case, the September 2, 1992 clarification was sent to FAG before questionnaire responses were due. *Final Results,* 60 Fed.Reg. at 10,957. Thus, in this case, the facts clearly support Commerce's application of the scope determination to the fourth administrative review. The Court adheres to its prior holding and sustains Commerce on this issue.

### 3. *Value–Added Tax Adjustment*

█ INA, SKF and FAG request a remand for Commerce to apply a tax-neutral amount rather than rate methodology in computing the VAT adjustment. INA's Mem.Supp.Mot.J. Agency R. at 21–23; SKF's Mem.Supp.Mot.J. Agency R. at 38–51; FAG's Mem.Supp.Mot.J. Agency R. at 10–13. Commerce agrees that a remand would be appropriate so that it may apply a tax-neutral methodology. Def.'s Partial Opp'n to Mots.J. Agency R. at 14–16. Torrington does not object to a remand on this issue. Torrington's Opp'n to Mots.J. Agency R. at 3.

In light of the decision of the United States Court of Appeals for the Federal Circuit ("CAFC") in *Federal–Mogul Corp. v. United States,* 63 F.3d 1572 (Fed.Cir.1995), which upheld Commerce's application of a tax-neutral methodology, the Court agrees with the parties that a remand is necessary. Therefore, this case is remanded to Commerce to apply its tax-neutral methodology.

### 4. *Sample and Prototype Merchandise*

█ FAG contends Commerce improperly included zero-priced or *de minimus* priced U.S. sales of sample and prototype merchandise in its margin calculation of USP. FAG maintains such sales are not in the ordinary course of trade and unfairly distort the measure of actual dumping. FAG's Mem.Supp.Mot.J. Agency R. at 15–19. In the alternative, FAG argues if such sales are included in the margin calculation, a circumstance of sale adjustment is necessary to counter any distortions. *Id.* at 19–21.

Commerce responds that neither the statute nor the regulation require Commerce to exclude sales of alleged samples and prototypes from its analysis. Commerce emphasizes that FAG's argument would result in reading an "ordinary course of trade" requirement into the definition of USP. Def.'s Partial Opp'n to Mots. J. Agency R. at 23–37. Commerce further maintains that a circumstance of sale adjustment is not necessary when the difference between sales is only price. *Id.* at 37–39.

The Court has recently held that Commerce's inclusion of prototype and sample sales in the calculation of USP is consistent with law. *FAG Italia S.p.A. v. United States,* 948 F.Supp. 67, 71–72 (1996); *FAG U.K. Ltd. v. United States,* 20 CIT ——, —— – ——, 945 F.Supp. 260, 264–65. The Court reasoned that Commerce is not required by statute or regulation to exclude zero-priced or *de minimus* sales from its analysis. *FAG U.K.,* 20 CIT at ——, 945 F.Supp. at 264. The Court further noted that sales may only be excluded if its inclusion would lead to unrepresentative price comparisons and extremely distortive calculations. 20 CIT at —— – ——, 945 F.Supp. at 264–65.

█ Finally, in order to disregard a sale as a sample, the respondent must establish the sale was a true *de minimus* sample by means of the appropriate procedures as set forth in *J.C. Hallman Mfg. Co. v. United States,* 13 CIT 1073, 1076, 728 F.Supp. 751, 753 (1989). In *J.C. Hallman,* the Court stated,

> [a sample] must [be] reported under [a] temporary importation bond as prescribed by the regulations. Compliance with the pertinent regulations is mandatory. Absent proof of importation of merchandise under bond for temporary purposes, or any other persuasive evidence to the contrary, Commerce would have no way of knowing that the merchandise *is not* imported for sale.

*Id.* (citations omitted).

As in the previous cases dealing with this issue, the respondent, FAG, has failed to provide the necessary evidence justifying an

exclusion of the sales at issue from USP calculations. Similarly, a circumstance of sale adjustment is not warranted as FAG has not demonstrated the existence of a *"bona fide* difference in the circumstances of the sales." 19 C.F.R. § 353.56(a)(1); *see also FAG U.K.,* 20 CIT at ——, 945 F.Supp. at 266. Thus, the Court adheres to its prior decisions and finds Commerce's actions to be consistent with law.

## 5. *Assessment Rate Methodology*

 In the Final Results, Commerce calculated an assessment rate for exporter's sales price ("ESP") sales for each importer/exporter by dividing that importer/exporter's potential uncollected dumping duties by the total entered value of the reviewed sales for that importer/exporter during the period of investigation. 60 Fed.Reg. at 10,905. FAG once again challenges this methodology, claiming that the calculation was arbitrary and inaccurate since the entered value of reviewed sales bears no relationship to the actual entries upon which this assessment rate would be applied. FAG's Mem.Supp. Mot.J. Agency R. at 22–24.

Commerce claims that FAG has presented no new arguments in this case and urges the Court to follow its prior decision upholding Commerce's methodology. Def.'s Partial Opp'n to Mots. J. Agency R. at 39–40 (citing *FAG Kugelfischer Georg Schafer KGaA v. United States,* Slip Op. 95–158, at 8–9, 1995 WL 549119 (Sept. 14, 1995), *aff'd,* 86 F.3d 1179 (Fed.Cir.1996)).

In light of both the recent affirmance by the CAFC of *FAG Kugelfischer* and FAG's failure to present any new arguments, the Court declines to reconsider its position on this issue. Commerce's assessment methodology is supported by substantial evidence on the agency record and consistent with law.

## 6. *Exclusion of Certain Home Market Sales*

In the Final Results, Commerce excluded reported home market sales for two customers from FAG's home market database based on the following explanation:

> For these sales, the evidence indicates that the merchandise in question was destined

for export and thus not for home consumption. We found at verification that FAG referred to these customers as "indirect exporters" and that FAG excluded sales to other "indirect exporters" based on its conclusion that these were export sales. In addition, one FAG subsidiary sold to one of these two "indirect exporters" from its export, rather than domestic, price list. We also visited and interviewed one of these resellers and found that it only sells in export markets. This reseller claimed that its suppliers, including FAG, know that it does not resell within Germany. For these reasons, we conclude that these sales were for export and not for domestic consumption. Therefore, these sales cannot be included in FAG's HM sales.

60 Fed.Reg. at 10,953.

FAG claims that Commerce's exclusion of the home market sales was arbitrary and unlawful. FAG argues that pursuant to 19 U.S.C. § 1677a(b) (1988), Commerce may base USP (or purchase price) on a sale in the home market to an unrelated reseller only if "the producer knew at the time of the sale that the product was destined for the United States." FAG's Mem.Supp.Mot.J. Agency R. at 31. FAG further maintains the standard for demonstrating imputed knowledge is high and, generally, when Commerce is not sure that 100% of a reseller's goods are exported to a known destination, Commerce does not find that the producer "should have known" the destination of the goods. *Id.* at 31–32 (citing *Television Receivers, Monochrome and Color, From Japan; Final Results of Antidumping Duty Administrative Review* ("*Television Receivers*"), 58 Fed.Reg. 11,211, 11,216 (1993); *Final Results of Antidumping Duty Administrative Reviews Oil Country Tubular Goods From Canada,* 55 Fed.Reg. 50,739, 50,740 (1990)). According to FAG, Commerce generally requires objective information that can be corroborated by the administrative record demonstrating that the producer knew the destination of the product at the time of the sale. FAG insists Commerce did not satisfy the burden of proof since the information gained through interviews was hearsay and incapable of being

corroborated by the administrative record. FAG's Mem.Supp.Mot.J. Agency R. at 31–35.

FAG also urges the Court to require Commerce to establish an objective, verifiable "bright-line" test for determining whether a particular sale should be reported as a home market sale. FAG suggests that the appropriate test for determining whether a sale is for export or home market consumption should be whether the VAT is charged and paid on the sale. FAG explains, under German law, all goods shipped to a home market venue are deemed to be for domestic consumption and must be levied with a VAT charge reflected in the company's books. *Id.* at 35–37.

In response, Commerce argues it based its decision to exclude the home market sales on substantial evidence contained in the administrative record. Commerce claims information discovered at verification supported the conclusion that FAG was aware that the "indirect exporters" exported their merchandise. In support of its position, Commerce suggests FAG knew the sales to the two customers classified by FAG as "indirect exporters" were indeed export sales and not sales for home consumption. Def.'s Partial Opp'n to Mots. J. Agency R. at 48–50.

In addition, Commerce emphasizes that its decision to exclude the sales was based upon 19 U.S.C. § 1677b(a), and not 19 U.S.C. § 1677a(b). Commerce notes it rejected Torrington's argument that Commerce should include sales to indirect exporters in the calculation of U.S. price, because there was no indication FAG knew which specific sales were destined for the United States and, therefore, the strict standard for imputing knowledge under § 1677a(b) was not met. Commerce maintains, however, section 1677b(a), the provision of the statute regulating the calculation of FMV, does not require knowledge of the destination of the merchandise. Def.'s Partial Opp'n to Mots. J. Agency R. at 51–53.

Finally, Commerce submits that the determination of whether sales are for home consumption must be made based on the particular facts of each case and not pursuant to a bright-line test. Commerce also points out that the VAT test suggested by FAG is inaccurate because VAT is collected on all sales for delivery in the home market regardless of whether the merchandise is sold for home market consumption. Def.'s Partial Opp'n to Mots. J. Agency R. at 56–57.

Defendant-intervenor Torrington agrees with Commerce's conclusion that the evidence gathered by Commerce was sufficient to support its finding that FAG knew or should have known the merchandise at issue was not for home consumption. Torrington's Opp'n to Mots. J. Agency R. at 46–50.

In rebuttal, FAG insists since no evidence exists to support a finding that FAG's customers exported 100% of the merchandise purchased from FAG, and since FAG did not have knowledge of the "export nature" of these sales transactions, Commerce's decision to exclude the sales is unsupported by law. FAG's Reply to Opp'n to Mots. J. Agency R. at 16–19.

■ At the outset, it is necessary for the Court to clarify the standard for determining whether sales of a respondent may be included in the home market database. According to FAG, Commerce must have evidence FAG knew or should have known the ultimate destination of the sale. Commerce submits that under 19 U.S.C. § 1677b(a), if FAG knew or should have known the sales were not for home consumption, even if FAG did not know the ultimate destination, then the sales could not be included in the home market database. Commerce's interpretation of the standard is consistent with the statute. United States price (or purchase price) refers to the price of merchandise sold "for exportation to the United States." 19 U.S.C. § 1677a(b). In contrast, section 1677b(a)(1) defines FMV as the price "at which such or similar merchandise is sold, or in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption." There is no reference in section 1677b(a) to the destination of goods not sold for home consumption. Therefore, the appropriate burden of proof for determining whether to exclude sales from the home market database in calculating FMV is whether

FAG knew or should have known that the merchandise was not for home consumption based upon the particular facts and circumstances surrounding the sales.[2]

▮ The next issue is whether Commerce had sufficient evidence to conclude FAG knew or should have known that the merchandise sold to "indirect exporters" were not for home consumption even if FAG did not know the ultimate destination of the merchandise. In *Federal–Mogul Corp. v. United States*, 17 CIT 1015, 1020–21, 1993 WL 379531 (1993), *modified*, 18 CIT 160, 1994 WL 88926 (1994), the Court stated,

> [i]n a situation where the petitioner has provided [Commerce] with evidence which a reasonable mind would accept as calling into question whether respondents were able to distinguish home market sales destined for consumption in the home market from home market sales destined for consumption in the U.S. market, [Commerce] is required to diligently inquire into these allegations.

In *Federal–Mogul,* Commerce had declined to investigate into evidence presented by the petitioner that at least one manufacturer determined that some home market sales were destined for consumption in the U.S. market. *Id.* at 1018–19. The Court remanded the case to Commerce to determine whether there was sufficient evidence that the respondents knew or should have known that certain sales were indeed destined for the U.S. market. *Id.* at 1022.

In this case, Torrington submitted factual information on November 17, 1993, regarding the issue of whether certain sales by several respondents, including FAG, were properly classified as home market sales. *Torrington Submission of Factual Information,* C.R.Doc. No. 58, Torrington's App., Ex. 5. During the subsequent verification of FAG's sales information, Commerce traced sales to two companies that export merchandise referred to by FAG as "indirect exporters." *Sales Verification Report for FAG Kugelfischer Georg Schäfer AG (FAG KGS),* P.R.Doc. No. 238, Def.'s App., Ex. 1, at 7–8.

However, Commerce was unable to determine on the basis of source documents whether the merchandise involved in the sales were sold domestically or exported. *Id.* FAG stated that while it did not maintain any records regarding the final destination of the sales made to the "indirect exporters," it assumed the sales were for domestic consumption, collected VAT and reported them as home market sales. *Id.* FAG also explained it did not collect VAT on sales to other indirect exporters when FAG shipped the merchandise abroad. *Id.* Commerce further determined that FAG sells to one of the companies at issue from export price lists but only collects VAT on sales shipped within Germany. *Id.*

Commerce also filed a separate verification report detailing information obtained as a result of interviews with German customers of FAG. *Verification Report—Interviews with German Customers of Respondent Manufacturers,* P.R.Doc. No. 237, Def.'s App., Ex. 2. The Program Manager, Michael Rill, reported that the Managing Director for one of the firms stated that his firm "only exports AFBs, though occasionally some sales are made to other exporters." *Id.* The Managing Director also stated that all of the suppliers know that the firm "is solely an exporter from their years of doing business with his company." *Id.* A tour of the company revealed that most of the merchandise was held in wooden shipping crates. *Id.*

The Court finds this evidence to be sufficient to support Commerce's finding that FAG knew or should have known the merchandise sold to the two companies were indeed for export. While FAG is correct that there is no evidence FAG knew the actual destination of the merchandise, FAG overlooks the fact that such knowledge is not necessary under 19 U.S.C. § 1677b(a). The interview and visit to one of the companies, and the verification that FAG sells to one of the companies from its export price list indicates FAG knew or should have known that the sales were not for domestic consumption.

---

2. The Court declines to adopt a bright-line test. The appropriate method for determining the existence of knowledge of the destination of goods is to examine the particular facts and circumstances of each case.

FAG would have the Court find that unless FAG knew the specific destination of the merchandise and actually admitted to such knowledge, Commerce cannot find FAG should have known the reseller would export the merchandise. However, under those circumstances, it would be extremely difficult for Commerce to ever conclude that a respondent knew sales were for export when deciding whether certain sales should be listed as home market sales for purposes of computing FMV.[3]

The sales from the export price list and the statements of the company representative indicate, at the very least, FAG should have known the sales were not for home consumption. The concept of imputed knowledge implies that the information regarding knowledge must be derived from extrinsic sources. The only way to determine actual knowledge is through an admission of the respondent. Without such an admission, Commerce had to look to other evidence to determine whether FAG should have known that the goods were not for home consumption. The evidence demonstrates that FAG made sales to one of the companies on the basis of its "export price" list which implies that FAG knew the reseller intended to export the goods. In addition, the comments of the representative of the firm visited by Commerce were sufficient to impute knowledge to FAG. It is highly unlikely that FAG would have no knowledge of the activities of its buyers. This was not a situation in which the reseller decided to export the merchandise on one occasion but, rather, the reseller specifically stated that it is an exporter firm. Based on this evidence, the Court finds Commerce's decision to exclude the sales from FAG's home market database consistent with law.

### 7. *Treatment of Home Market Expenses as Indirect*

■ In the review at issue, Commerce treated certain home market expenses re-

ported by FAG on a customer-specific basis—third-party payments, early payment discounts and negative billing adjustments—as indirect selling expenses. *Final Results,* 60 Fed.Reg. at 10,933. Commerce treated positive billing adjustments as direct expenses. *Id.*

FAG argues that Commerce's treatment of the home market expenses was contrary to Commerce's past treatment of home market expenses reported in exactly the same manner. Specifically, FAG points out that Commerce accepted customer-specific reporting in the first administrative review, the second administrative review and the less than fair value investigation. FAG's Mem.Supp. Mot.J. Agency R. at 38–39 (citing *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 31,692, 31,717 (1991); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 28,360, 28,401 (1992); *Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed.Reg. 18,992, 19,056 (1989)). FAG maintains its reporting of the expenses was accurate and complete and Commerce has given no justifiable rationale for departing from its past practice regarding such expenses. FAG's Mem.Supp.Mot.J. Agency R. at 40.

FAG further asserts Commerce's actions were punitive, especially regarding its treatment of billing adjustments. According to FAG, the adjustments should all be treated as either direct or indirect (although FAG does not concede the latter). FAG highlights the fact that Commerce verified that many

---

**3.** This decision is not intended to alter the standard for imputed knowledge pursuant to 19 U.S.C. § 1677a(b). As both FAG and Commerce acknowledge, section 1677a(b) requires knowledge that the merchandise is purchased from a reseller for exportation to the United States. The prior reviews cited by FAG rejecting claims of imputed knowledge involved situations in which

only some of the merchandise was destined for the United States. *See, e.g., Television Receivers,* 58 Fed.Reg. at 11,216. Under 19 U.S.C. § 1677b(a) it is not necessary for the respondent to have knowledge that all of the merchandise sold is destined for the United States in order to impute knowledge that the sales were not intended for home consumption.

home-market expenses were reported on a transaction-specific basis. *Id.* at 41–42.

Commerce responds that it established a general policy during the second and third administrative reviews of accepting claims for post-sale price adjustments as direct adjustments to price if actual amounts are reported for each transaction. Pursuant to this policy, if adjustments are not fixed and constant but are allocated on a customer or product-specific basis, Commerce treats them as indirect selling expenses. Commerce claims it applied this policy to FAG and, therefore, treated FAG's billing adjustments as indirect selling expenses. Def.'s Partial Opp'n to Mots. J. Agency R. at 59–60.

In addition, Commerce defends its differential treatment of positive and negative adjustments by explaining that the treatment of certain adjustments as indirect or direct induces respondents to provide Commerce with actual expense information. Commerce states that threatening to treat positive billing adjustments as indirect would not provide the same incentive. *Id.* at 60.

Torrington argues Commerce's actions were consistent with the decisions of the CAFC distinguishing between direct expenses that vary with the quantity sold and indirect expenses not tied to particular sales. Torrington's Opp'n to Mots. J. Agency R. at 50 (citing *Torrington Co. v. United States,* 68 F.3d 1347, 1354 (Fed.Cir.1995); *Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1569 n. 4 (Fed.Cir.1994)).

In rebuttal, FAG argues that according to the CAFC, the relevant inquiry is the manner in which the expenses were incurred as opposed to the manner in which they were recorded. FAG insists its post-sale billing adjustments, third-party payments and early payment discounts vary according to the actual sales made and, therefore, constitute direct expenses. FAG also refutes Commerce's incentive argument by stating that FAG did report actual expense data for the home market expenses at issue. FAG's Reply to Opp'n to Mots. J. Agency R. at 21–24.

In the Final Results, Commerce explained its policy concerning discounts, rebates and price adjustments in the following general statement:

> As a general manner, the Department only accepts claims for discounts, rebates, and price adjustments as direct adjustments to price if actual amounts are reported for each transaction. Thus, discounts, rebates, or price adjustments based on allocations are not allowable as direct adjustments to price. Allocated price adjustments have the effect of distorting individual prices by diluting the discounts or rebates received on some sales, inflating them on other sales, and attributing them to still other sales that did not actually receive any at all. . . .

> Therefore, we have made direct adjustments for reported HM discounts, rebates, and price adjustments if (a) they were reported on a transaction-specific basis and were not based on allocations, or (b) they were granted as a fixed and constant percentage of sales on all transactions for which they are reported. If these adjustments were not fixed and constant but were allocated on a customer-specific or a product-specific basis, we treated them as if they were indirect selling expenses.

60 Fed.Reg. at 10,929. Commerce applied this policy to FAG as follows:

> We note that FAG–Germany originally did not describe its methodology for reporting HM billing adjustments. When asked about the HM billing adjustment reporting methodology in the supplemental questionnaire, FAG–Germany inaccurately responded that "[b]illing adjustments were reported on a transaction-specific basis." The fact that the majority of HM billing adjustments were not reported on a transaction-specific basis but were instead reported using customer-specific allocations was not discovered until verification. Since we cannot distinguish which billing adjustments were reported on a transaction-specific basis, we treated all negative billing adjustments as indirect expenses.

> With respect to FAG–Germany's additional arguments concerning differences in the treatment of positive and negative billing adjustments, we disagree that both must be treated in the same manner.

The treatment of positive billing adjustments as direct adjustments is appropriate, because treating these adjustments as indirect would provide an incentive to report positive billing adjustments on a customer-specific basis in order to minimize their effect on the margin calculations. That is, by treating positive billing adjustments, which would be upward adjustments to FMV, as indirect expenses, there may be no upward adjustment to FMV. Consequently, respondents would have no incentive to report these adjustments as requested (*i.e.*, on a transaction-specific basis).

60 Fed.Reg. at 10,933 (citations omitted).

The Court finds Commerce's actions to be inconsistent with law, but for different reasons than those stated by FAG. The CAFC recently clarified the standard for determining whether adjustments to price should be treated as direct or indirect expenses when calculating FMV. *See Torrington Co. v. United States*, 82 F.3d 1039, 1047–51 (Fed. Cir.1996). In the review involved in *Torrington*, Commerce treated post-sale price adjustments reported by a respondent as indirect expenses because they were reported on a customer-specific basis. *Id.* This Court remanded the case to Commerce to deny the adjustment completely because Commerce had permitted post-sale price adjustments to be calculated using out-of-scope merchandise. *Id.* at 1048. On appeal, the CAFC upheld the Court's denial of the adjustment, but based its affirmance on different reasoning. The Court held that the adjustment was improper because the post-sale price adjustments were direct expenses, regardless of the allocation method used by the respondent and, therefore, could not provide the basis for an ESP offset.[4] *Id.* at 1050–51.

In reaching its decision, the CAFC distinguished between the calculation and the recordation or allocation of the adjustments. The court found that the post-sale price adjustments at issue in that case were indeed direct expenses because they were related to

particular sales and varied with the quantity of the particular item sold. *Id.* at 1050. According to the CAFC, the recordation or allocation method does not change the nature of the expenses. *Id.* at 1050–51. The Court concluded that because 19 C.F.R. § 353.56(b)(2) (the ESP offset regulation) "provides for 'a deduction from [foreign market value] for all selling expenses *except direct selling expenses*,' Commerce cannot permit a deduction for post-sale price adjustments pursuant to this provision. *Id.* at 1051 (quoting *Sharp Corp. v. United States*, 63 F.3d 1092, 1096 (Fed.Cir.1995) (emphasis added)).

Turning to the facts of this case, the Court must first determine whether FAG's home market adjustments were direct expenses. As FAG insists, post-sale billing adjustments, third-party payments and early payment discounts do vary according to the quantity sold and, therefore, constitute direct expenses. *See Torrington Co. v. United States*, 20 CIT ——, —— —— ——, 926 F.Supp. 1151, 1158–59 (1996) (upholding Commerce's denial of adjustment for post-sale price adjustments where respondents reported expenses on a customer-specific basis). In fact, none of the parties disputes the direct nature of the expenses. Commerce could not treat the adjustments as direct expenses because of FAG's failure to tie the expenses to specific transactions. *See Final Results*, 60 Fed. Reg. at 10,933; *Torrington*, 20 CIT at ——, 926 F.Supp. at 1158. However, FAG's failure to tie the expenses to the product sold "did not deprive the expenses of their direct relationship to the sales under consideration." *Torrington*, 20 CIT at ——, 926 F.Supp. at 1158.

Therefore, in light of the CAFC decision in *Torrington*, Commerce improperly treated the expenses as indirect. Commerce's policy statement is inconsistent with law to the extent that it permits direct expenses to be treated as indirect expenses on the basis of the allocation methodology of respondents. This case is remanded to Commerce to deny

**4.** While Commerce did not state that the adjustment was allowed pursuant to an ESP offset, the Court noted that the only means by which FMV may be adjusted for indirect selling expenses is the ESP offset provision contained in Commerce's regulations. *Torrington*, 82 F.3d at 1049 n. 13 (referring to 19 C.F.R. § 353.56(b)(2)).

the adjustment to FMV for FAG's negative billing adjustments, post-sale price adjustments and third-party discounts incurred in the home market.

### 8. SKF's Rebates, Cash Discounts and Billing Adjustments

In the Final Results, Commerce denied any adjustment to FMV for SKF Germany's cash discounts, billing adjustment 2 and support rebate ("rebate 2"). 60 Fed.Reg. at 10,932. SKF objects to Commerce's treatment of these expenses. SKF acknowledges that this Court has already upheld Commerce's treatment of SKF's billing adjustments and cash discounts as indirect expenses. SKF's Mem.Supp.Mot.J. Agency R. at 12 (citing *SKF USA Inc. v. United States,* 19 CIT ——, —— – ——, 888 F.Supp. 152, 158–59 (1995); *SKF USA Inc. v. United States,* 19 CIT ——, —— – ——, 875 F.Supp. 847, 852–53 (1995)). SKF notes the issue concerning rebate 2 has not yet been addressed by this Court.

Regarding rebate 2, SKF argues its reporting of the rebate was consistent with Commerce's requirements for direct expenses. SKF explains that rebate 2 is a support rebate granted by SKF Germany to its distributors/dealers in order to ensure a minimum profit level on sales to selected customers, and is based on invoices from the distributor/dealer to its final customer. SKF further states that the rebate 2 adjustments are calculated on a customer-specific basis because the rebates are granted to customers based on the customers' resales, not on the direct sales from SKF to those customers. In addition, SKF contends that the support rebates are reported by SKF for each applicable distributor/dealer as a fixed and constant percentage of all sales to such distributor/dealer. SKF emphasizes that establishing a link between a rebate and payment by SKF Germany and a specific transaction to SKF Germany's customer is impossible, because rebate 2 involves lump sum payments to distributors tied to those distributors' sales, not SKF Germany's sales. Hence, according to SKF, the treatment of expenses reported on a fixed percentage basis as direct is consistent with the

standards of both the Court and Commerce. SKF's Mem.Supp.Mot.J. Agency R. at 16–19 (citing *Torrington Co. v. United States,* 17 CIT 922, 935, 832 F.Supp. 379, 390 (1993), *modified,* 18 CIT 148, 850 F.Supp. 12 (1994)).

SKF also asserts that its cash discounts constitute a hybrid of both transaction-specific and customer-specific adjustments and are calculated and reported on the basis of specific transactions on which a customer was entitled to a discount. SKF explains that it reported a separate rate of discount for each customer number and that the reported discount rates were applied to only eligible transactions. SKF further states that the actual payment of each discount usually occurs as a remittance applicable to multiple invoices and, therefore, cannot be traced to a specific transaction. Alternatively, SKF insists Commerce should have at least treated the expenses as indirect rather than denying the adjustment completely. *Id.* at 19–23.

With respect to SKF Germany's billing adjustment 2, SKF maintains transaction-specific reporting was not feasible because the adjustments generally related to multiple invoices, multiple products or multiple invoice lines. According to SKF, Commerce erred by not treating SKF Germany's billing adjustment 2 as an indirect selling expense. *Id.* at 23–24.

Finally, SKF contests the decisions of this Court requiring Commerce to change its policies regarding discounts, rebates and price adjustments. SKF argues that the result of these cases has been a punitive application of the antidumping law contravening the purpose of the statute. *Id.* at 25–30.

Commerce responds that it disallowed SKF's claimed adjustments because they were not reported on a customer or transaction-specific basis. Commerce claims its actions were consistent with the Court's prior decisions holding Commerce may not permit adjustments for allocated post-sale price adjustments which cover out-of-scope merchandise. Based on SKF's reporting methodologies for rebate 2, cash discounts and billing adjustment 2, Commerce asserts it could not distinguish between in-scope and out-of-scope

merchandise. Def.'s Partial Opp'n to Mots. J. Agency R. at 17–21.

As SKF acknowledges, the Court has already addressed Commerce's rejection of SKF'S reporting methodologies of cash discounts and billing adjustments for purposes of treating them as direct expenses to price. *SKF USA Inc. v. United States,* 19 CIT at ——–––——, 888 F.Supp. at 158–59; *SKF USA Inc. v. United States,* 19 CIT at ——–––——, 875 F.Supp. at 852–53. The Court adheres to those holdings to the extent that Commerce's decision to refuse to treat the adjustments reported on a customer-specific basis as direct expenses is supported by law. In those cases, however, the Court did allow Commerce to treat the adjustments as indirect expenses. In the case at bar, Commerce disallowed any adjustment for SKF's billing adjustments 2 and cash discounts because there was no way for Commerce to segregate the adjustments granted on scope merchandise from those granted on non-scope merchandise. 60 Fed.Reg. at 10,932. Based on the CAFC's decision in *Torrington,* 82 F.3d at 1047–51, the Court finds that Commerce's refusal to treat the billing adjustments and cash discounts as indirect expenses was proper, but for different reasons than those asserted by Commerce. As discussed in reference to FAG, adjustments and discounts which are actually direct expenses may not be treated as indirect expenses pursuant to the ESP offset provision. *See supra* at 34–36.

A remand is necessary, however, with respect to rebate 2. The Court has permitted Commerce to treat rebates as direct expenses where the rebates were granted as a straight percentage of all sales. In *Torrington,* 20 CIT at —— n. 2, 926 F.Supp. at 1157 n. 2 (citing *Torrington,* 17 CIT at 935, 832 F.Supp. at 390), the Court upheld Commerce's treatment of a respondent's rebate expenses as direct expenses stating that customer-specific allocation is permissible when the percentage amount is the same across products. SKF's rebates are "based on the application of uniform rebate rates to all of a customer's sales." SKF's Supplemental Questionnaire Response, P.R.Doc. No. 160, SKF's App., Ex. 3, at 22–23. This

methodology is sufficient to permit a direct adjustment to FMV. Accordingly, this case is remanded to Commerce to allow a direct adjustment to FMV for SKF's rebate 2.

9. *Application of Reimbursement Regulation*

In the Final Results, Commerce refused to apply 19 C.F.R. § 353.26, the so-called "reimbursement regulation," for the following reasons:

> We disagree with Torrington ... that the Department should deduct from ESP antidumping duties allegedly reimbursed by foreign producers to their U.S. affiliates. In this administrative review neither party has identified record evidence that there was reimbursement of antidumping duties. Evidence of reimbursement is necessary before we can make an adjustment to USP. This has been our consistent interpretation of 19 C.F.R. 353.26, the reimbursement regulation, and was upheld by the Court in *Otokumpu [Outokumpu] Copper Rolled Products AB v. United States* [17 C.I.T. 848], 829 F.Supp. 1371 (CIT 1993).
>
> . . . .
>
> We also disagree with Torrington ... that the amount of antidumping duties assessed on imports of subject merchandise constitutes a selling expense and, therefore, should be deducted from ESP.

60 Fed.Reg. at 10,907.

Torrington argues Commerce erred by failing to apply the reimbursement regulation in all instances where (1) transfer prices between related exporters and importers were less than the cost of production plus profit, or, alternatively, cost of production, and (2) actual dumping margins were found. Torrington's Mem.Supp.Mot.J. Agency R. at 17–28.

In response, Commerce states that there is no evidence on the record that the exporter paid duties or reimbursed the related importer through alleged intra-company transfers. Commerce further argues that mere allegations that intra-company transfers were actually reimbursements of antidumping duties are insufficient to require Commerce to in-

vestigate the transfers. Commerce does request a remand, however, to explain the circumstances in which Commerce would apply the regulation in an ESP situation. Def.'s Partial Opp'n to Mots. J. Agency R. at 66–71.

Defendant-intervenors, NTN Bearing Corporation of America and NTN Kugellagerfabrik (Deutschland) GmbH (collectively "NTN") generally agree with the arguments advanced in support of Commerce's decision not to apply the reimbursement regulation in this case. NTN's Opp'n to Mot.J. Agency R. at 5–13.

The Court has already addressed this issue in previous cases dealing with the same administrative review. The Court found that Torrington failed to provide sufficient evidence of a link between intracorporate transfers and the reimbursement of antidumping duties to warrant requiring Commerce to commit resources to conduct an investigation. *Torrington Co. v. United States,* 20 CIT ——, ——, 944 F.Supp. 930, 933–34 (1996); *FAG Italia,* 948 F.Supp. at 74–75. The Court did grant Commerce a remand, however, to explain the circumstances in which it will apply the regulation in an ESP situation. *Torrington,* 20 CIT at ——, 944 F.Supp. at 934; *FAG Italia,* 948 F.Supp. at 74–75. In accordance with these decisions, the Court sustains Commerce's decision not to apply the reimbursement regulation to adjust USP. The Court remands this issue to Commerce, however, to explain the circumstances in which it will apply the regulation in an ESP situation.

### 10. *Calculation of Profit for Constructed Value*

Torrington claims Commerce should not have included below-cost sales in calculating profit for constructed value. According to Torrington, the inclusion of such sales seriously distorts the statutory framework since below-cost sales are excluded when sales form the basis of FMV pursuant to 19 U.S.C. § 1677b(b). Torrington contends the same sales should be disregarded when construct-

ed value serves as FMV. Torrington's Mem. Supp.Mot.J. Agency R. at 28–34.

In the alternative, Torrington argues that even if the Court concludes below-cost sales were properly included in the constructed value calculations, Commerce should have recomputed respondents' profits on the basis of the sample sales reported. Torrington submits that Commerce should have presumed profit based on sales of such or similar merchandise as reported by the respondents would be representative of the profit for the general class or kind of merchandise, and should have used the derived profit figures if they were higher than the statutory minimum of eight percent. *Id.* at 34–37.

▮ Again, this issue is one previously addressed by the Court. This Court has recently concluded in several cases that in order for below-cost sales to be excluded from a constructed value calculation, a petitioner must show that sales were made outside the ordinary course of trade. *FAG Italia,* 948 F.Supp. at 75; *FAG U.K.,* 20 CIT at ——, 945 F.Supp. at 269; *Torrington,* 20 CIT at ——–——, 944 F.Supp. at 934–35; *Timken Co. v. United States,* 20 CIT ——, ——–——, 930 F.Supp. 621, 624–25 (1996); *Federal–Mogul Corp. v. United States,* 20 CIT ——, ——, 918 F.Supp. 386, 403 (1996); *Torrington Co. v. United States,* 19 CIT ——, ——, 881 F.Supp. 622, 633 (1995). Torrington has failed to demonstrate the below-cost sales are actually outside the ordinary course of trade. Therefore, Commerce's decision to include below-cost sales in calculating profit for constructed value purposes is supported by the agency record and law.

▮ The Court has also addressed and rejected Torrington's alternative argument. In *Federal–Mogul,* 20 CIT at ——–——, 918 F.Supp. at 403–04, the Court held that while Commerce has the authority to select appropriate samples for determining USP and FMV pursuant to 19 U.S.C. § 1677f–1 (1988),[5] Commerce also has the discretion not to use samples at all. Consequently, Tor-

---

5. 19 U.S.C. § 1677f–1(b) states:
 The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.

rington's alternative argument lacks merit as well.

### 11. *Use of Constructed Value*

 Torrington contends Commerce erred by resorting to constructed value after finding the most similar home market model was sold below cost in more than 90 percent of the home market sales, without first determining whether there were any similar models to serve as priced-based comparisons. Torrington insists the statute indicates a preference for sales over costs comparisons. Torrington's Mem.Supp.Mot.J. Agency R. at 37–41.

Commerce responds that 19 U.S.C. § 1677b(b) directs Commerce to resort to constructed value after disregarding home market sales of "matched" bearings made below the cost of producing the merchandise in substantial quantities over an extended period of time. Def.'s Partial Opp'n to Mots. J. Agency R. at 80–86.

The Court has addressed this issue and concluded that Commerce's methodology is consistent with the statute. *See Federal–Mogul,* 20 CIT at ———–——, 918 F.Supp. at 395–97; *see also Torrington,* 20 CIT at ———–——, 944 F.Supp. at 935–36; *FAG U.K.,* 20 CIT at ———, 945 F.Supp. at 270. In *Federal–Mogul,* the Court held "[t]here is no requirement in 19 U.S.C. § 1677b(b) that Commerce first investigate whether it can make another match based on the next most similar merchandise before resorting to constructed value." 20 CIT at ———, 918 F.Supp. at 397. Based on the Court's prior decisions, Commerce is sustained on this issue.

### 12. *Adjusting FMV for Pre–Sale Inland Freight*

 In spite of the decision of the CAFC in *Torrington,* 68 F.3d at 1356, holding that Commerce may deduct indirect home market transportation expenses from FMV pursuant to the ESP offset cap, Torrington contests Commerce's decision to adjust FMV for pre-sale inland freight expenses. Since the filing of these briefs, the CAFC has reaffirmed its position on this issue. *See Torrington,* 82 F.3d at 1047. Therefore, in light of the

decisions of the CAFC, the Court finds Commerce's actions to be consistent with law.

### 13. *Adjustment for INA's Ocean/Air Freight Expenses*

 In the Final Results, Commerce accepted INA's reporting of ocean/air freight expenses on a per-unit basis. 60 Fed.Reg. at 10,944. Torrington claims Commerce should not have accepted INA's reporting of average freight cost based upon a total of 48 shipments. Torrington points out that INA reported an average cost based upon a sample consisting of the highest and lowest value air and freight shipments for each month during the period of review. According to Torrington, the methodology used by INA results in an inaccurate adjustment because the freight costs vary from shipment to shipment. Torrington suggests that in order to have an accurate representation of the freight expenses, each of the forty-eight sample shipments must represent approximately a forty-eighth of all the shipments. Torrington also asserts Commerce did not possess submissions from INA concerning the weight of the shipments, making verification impossible. To remedy the calculations, Torrington insists Commerce should either obtain the necessary information to make an accurate adjustment or resort to best information available. Torrington's Mem.Supp.Mot.J. Agency R. at 43–51.

Commerce defends its actions pursuant to its authority under 19 U.S.C. § 1677f–1, to use sampling and averaging when a large number of sales is involved. Commerce also maintains that at verification it examined both INA's reporting methodology and a randomly selected sample of its actual calculation of freight costs. In addition, Commerce asserts it verified that INA properly allocated freight charges to all relevant sales. As a final step, Commerce states it tested the sample of shipments used by INA to calculate its per-unit movement expenses to assess whether the per-unit charges were representative of the shipment-specific per-unit charges. Based upon its verification methodology, Commerce insists it properly concluded that INA's freight cost methodology yield-

ed representative results. Def.'s Partial Opp'n to Mots. J. Agency R. at 88–94.

INA, defendant-intervenor and plaintiff, supports Commerce's position, arguing that Commerce verified INA's reporting methodology and that the verification was supported by substantial evidence on the agency record. INA specifically emphasizes that a mislabeled exhibit contained the weight information that Torrington claims was missing. INA's Opp'n to Mot.J. Agency R. at 15–16.

In rebuttal, Torrington argues that the case law acknowledging Commerce's broad discretion to rely on sampling pursuant to 19 U.S.C. § 1677f–1 is not applicable to this case since the respondent, not Commerce, chose to use samples. Torrington further contends that even if section 1677f–1 guides the analysis in this case, Commerce should not have accepted INA's methodology without verifying that the samples were indeed representative of the actual costs. Torrington's Reply to Opp'n to Mot.J. Agency R. at 37–44.

Commerce described its verification procedures for INA's movement expenses in the following manner:

For the movement expenses that INA incurred, we examined freight invoices, invoices for brokerage and handling fees, packing lists, and shipping contracts with independent and related freight carriers. We examined these primary source documents at random to determine whether the information that INA used to calculate per-unit movement expenses was accurate. We found no discrepancies.

Further, we examined entries in INA's accounts payable ledger and expense ledgers for freight charges, payment records from the voucher register, and canceled checks demonstrating payment of freight bills. For U.S. inland freight to unrelated customers, we examined the method that INA used to allocate this expense to the relevant sales. We found no discrepancies. *See* exhibit 2.

We also tested the sample of shipments that INA used to calculate its per-unit movement expenses to assess whether the per-unit charges were representative of shipment-specific per-unit charges. We

first examined documents for the most recent shipment of each part number examined during our sales traces. We then requested that INA calculate per-unit expenses using all air and sea shipments for a randomly selected week during the review period. Using both of these methods, we found that INA's method of sampling yielded representative results. *See* exhibit 3.

*Fourth Administrative Review of Antidumping Duty Order on AFBs From Germany: Verification of Exporter's Sales Price Information Submitted by INA Bearing Company* (*"Verification of INA"*), P.R.Doc. No. 247, Def.'s App., Ex. 4, at 5–6.

Commerce may decide to use averaging or sampling techniques pursuant to 19 U.S.C. § 1677f–1, which states the following:

For the purpose of determining United States price or foreign market value under sections 1677a and 1677b of this title, and for purposes of carrying out annual reviews under section 1675 of this title, the administering authority may—

(1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required, and

(2) decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise.

**(b) Selection of samples and averages**

The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.

The statute explicitly grants Commerce the authority to select the appropriate samples as long as the samples are "representative of the transactions under investigation." 19 U.S.C. § 1677f–1. In addition, the Court has consistently recognized that Commerce has been given broad discretion in its sample selection methodology. *Nachi–Fujikoshi Corp. v. United States,* 19 CIT ——, ——, 890 F.Supp. 1106, 1109 (1995); *see also GMN Georg Muller Nurnberg AG v. United States,* 15 CIT 174, 179, 763 F.Supp. 607, 612 (1991);

*Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT 13, 20–22, 704 F.Supp. 1114, 1120–22 (1989), *aff'd,* 901 F.2d 1089 (Fed.Cir.), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).

 While Torrington correctly asserts that 19 U.S.C. § 1677f–1 grants Commerce, not respondents, sole authority to select samples, this Court has already found "nothing wrong with the ITA's acceptance of respondent's proposed sampling methodology as long as that methodology is reasonable and, based on information in the administrative record, is likely to be representative of the underlying information." *Torrington Co. v. United States,* 17 CIT 967, 972, 832 F.Supp. 405, 410 (1993). The Court explained the

key issue is that the ITA must closely examine the proposed methodology and make a determination that is reasonable and representative. ITA cannot simply accept a respondent's methodology without investigation. As long as the ITA has made this determination, it is in compliance with 19 U.S.C. § 1677f–1.

*Id.*

Commerce's actions were consistent with the requirements of 19 U.S.C. § 1677f–1. Commerce did not blindly accept INA's proposed sampling methodology. Rather, Commerce verified that the reported sample did indeed represent the movement expenses under consideration by examining primary documents to ensure that INA used accurate data, verifying INA's allocations and testing INA's sample by comparing it to a random sample of shipments. *Verification of INA,* P.R.Doc. No. 247, Def.'s App., Ex. 4, at 5–6. Torrington has not pointed to anything in the record to persuade the Court that Commerce did not adequately verify that the samples reported by INA were representative of the ocean/air freight costs actually incurred. The Court sustains Commerce on this issue.

14. *INA's Advertising Expenses*

 Torrington objects to Commerce's refusal to deduct a portion of INA–FRG's advertising expenses from USP. According to Torrington, INA–FRG incurred advertising expenses for sales in both the home and export markets. In support of its position,

Torrington emphasizes that INA stated in its questionnaire response that the advertising expenses consisted of media advertising and trade shows which were directed to both home and export markets. Torrington further claims Commerce's examination of cost centers and financial records was insufficient for the purpose of verifying whether the advertising expenses were in part attributable to export sales. Torrington's Mem. Supp.Mot.J. Agency R. at 51–54.

Commerce responds that it found no evidence in the record indicating INA incurred advertising expenses for sales to customers in the United States. Therefore, Commerce insists that it properly decided not to deduct such expenses from INA's USP. Def.'s Partial Opp'n to Mots. J. Agency R. at 95.

In support of Commerce's position, INA maintains that INA–FRG does not have direct selling responsibility with respect to customers in the U.S. and does not direct its advertising to the U.S. market. INA explains that all sales of the subject merchandise to U.S. customers were made by INA–USA, the related importer in the United States. INA's Opp'n to Mot.J. Agency R. at 17–18.

In the Final Results, Commerce addressed Torrington's concerns as follows:

During our verification of INA's U.S. subsidiary, we confirmed that the subsidiary incurred advertising expenses for U.S. sales. Conversely, we found no evidence during our verification of advertising expenses at INA's headquarters in Germany that INA incurred any expenses for advertising directed toward customers in the United States. Therefore, we have not deducted these expenses from INA's USP for these final results.

60 Fed.Reg. at 10,910.

In response to Commerce's request for information concerning INA–FRG's indirect advertising expenses, INA explained that it was not feasible to determine INA–FRG's indirect advertising expenses separately for the home market and for the export market. INA's Supplemental Questionnaire Response, P.R.Doc. No. 165, Def.'s App., Ex. 5, at 27. INA further stated that the indirect advertis-

ing expenses "comprise of INA–FRG media advertising (newspapers and trade journals), trade shows, advertising presents, catalogues, price lists and brochures." *Id.* The presents, catalogues, price lists and brochures are distributed in the home market and in the export market. *Id.* INA also explained that media advertising and trade shows are directed to INA–FRG's customers in the home market and in the export market at the same time. *Id.* As an example, INA explained "a trade show held in Paris is not only visited by customers having a place of business in France but also by customers having a place of business in Germany or elsewhere." *Id.*

The statements in INA's supplemental questionnaire do not support Torrington's contention that INA–FRG incurred advertising expenses for the purpose of making sales to U.S. customers. INA's statements concerning the export markets do not lead to the conclusion that INA–FRG incurs expenses for advertising directed at the U.S. market. At most, INA's supplemental questionnaire response raised concerns that Commerce addressed at verification. *See Final Results,* 60 Fed.Reg. at 10,910; *see also Fourth Administrative Review of Antidumping Duty Orders on AFBs From Germany: Verification of Home Market Sales and Exporter's Sales Price Information Submitted by INA Walzlager Schaeffler,* P.R.Doc. No. 257, Torrington's App., Ex. 10, at 8. The Court has found nothing in the record to contradict Commerce's findings and, therefore, upholds Commerce on this issue.

15. *Allocation of INA's Indirect Selling Expenses*

■ Torrington claims Commerce failed to deduct from USP all export selling expenses that INA incurred in Germany. According to Torrington, INA reported indirect selling expenses incurred on behalf of U.S. sales which should have been deducted from USP. Torrington contends INA has selling subsidiaries in markets around the world and that, because the selling structures in the other export markets are the same as those it maintains in the U.S., the allocation of expenses should be the same for sales to U.S.

subsidiaries and sales to other foreign markets. Torrington also insists Commerce's verification did not prove that the expenses at issue were not attributable to U.S. sales. Torrington's Mem.Supp.Mot.J. Agency R. at 54–58.

In response, Commerce argues that Torrington has failed to provide any evidence to demonstrate that INA's selling structures in other export markets are the same as INA's selling structure in the U.S. market and that all appropriate selling expenses have not been attributed to U.S. sales. Even if some expenses were not properly allocated, Commerce alleges that the error was negligible. Commerce also defends its verification as being adequate. Def.'s Partial Opp'n to Mots. J. Agency R. at 96–98.

INA agrees with Commerce's position and explains that the indirect selling expenses allocated to export sales, referred to by Torrington, reflect INA–FRG selling activities to customers for whom it has direct selling responsibility. In contrast, INA–USA has its own sales and customer support activities and indirect selling expenses. INA insists that the INA–USA expenses cover activities for sales to unrelated customers comparable to the expenses incurred by INA–FRG for sales to its unrelated customers and, therefore, the allocation requested by Torrington would result in double counting of expenses. INA's Opp'n to Mot.J. Agency R. at 18–19.

Commerce explained its position regarding the export selling expenses in the Final Results as follows:

During our verification at INA's headquarters in Germany, we found that INA properly reported all expenses that it incurs specifically for export sales to its U.S. subsidiary. Further, we found no evidence that INA incurred the indirect selling expenses at issue to support sales to unrelated customers in the United States; rather, INA incurs these expenses in Germany in making sales to customers outside the United States. Therefore, we conclude that the indirect selling expenses in question are not related to U.S. sales. Accordingly, we have not deducted these expenses for INA's USP for these final results.

60 Fed.Reg. at 10,917–18. The referenced verification report contains the following conclusions of Commerce:

> INA reported the salaries, benefits, overhead, and all other expenses for the "market America" cost center at IVS and the export cost center at SWH. We reviewed the reported expenses that IVS incurred in the manner described above for home market indirect selling expenses. We found no discrepancies in the reporting of the expenses. Company personnel explained that the "market America" cost center captured the expenses of the sales team responsible for making sales to North, Central, and South America; in INA's questionnaire response, the expenses are allocated over total export sales. Finally, we examined data on total export sales and sales to that INA Bearing Company that INA used to allocate these expenses. We traced the reported total export sales and total sales to INA Bearing Company to the relevant audited financial statements. We found no discrepancies.

P.R. Doc. No. 257, Torrington's App., Ex. 10, at 9.

Torrington has failed to demonstrate that Commerce's refusal to adjust USP for export selling expenses was not supported by substantial evidence on the agency record. In fact, Torrington highlights only one cost center that could have been attributed to U.S. sales only. Torrington does not provide any evidence that INA incurred the expenses related to the referenced cost center to support sales to unrelated customers in the United States, beyond mere speculation concerning the structure of INA's U.S. subsidiaries. Commerce verified the accuracy of INA's reporting of its indirect selling expenses, and there is no indication in the record that Commerce's verification was deficient or incomplete. Accordingly, the Court finds Commerce's refusal to adjust USP to be supported by substantial evidence on the agency record.

---

**6.** The question of whether Commerce should have accepted INA's original reporting is an issue of law rather than a clerical error concern.

### 16. *Clerical Error*

Torrington contends Commerce committed a clerical error with respect to INA's research and development expenses. In its supplemental questionnaire response, INA stated that it deducted research and development expenses from its home market selling expenses and added research and development expenses to its general and administrative expenses. Torrington objects to Commerce's failure to modify its calculations to remove research and development expenses from INA's indirect selling expenses. Torrington's Mem.Supp.Mot.J. Agency R. at 60–61.

Commerce argues that there was no clerical error committed. Commerce points out that while INA did make the above changes in its supplemental questionnaire response, INA objected to the supplemental questionnaire and requested that Commerce use the indirect selling expenses reported in INA's original response. As a result, Commerce submits it used INA's indirect selling expenses, including research and development expenses, for the Final Results. Commerce also urges the Court to bar Torrington from arguing this issue before the Court because it did not raise the issue at the administrative level. Def.'s Partial Opp'n to Mots. J. Agency R. at 99–103.

INA agrees with the position taken by Commerce regarding the alleged clerical error. INA's Opp'n to Mot.J. Agency R. at 19–21.

The Court agrees that no clerical error was committed. There is no mention in either the Final Results or Commerce's analysis for the preliminary results of an adjustment to indirect selling expense for research and development costs. *See Commerce's Analysis Memorandum for Preliminary Results of Fourth Review of INA Walzlager*, P.R.Doc. No. 241, Def.'s App., Ex. 7, at 8. As Commerce argues, the record's silence on this issue indicates that Commerce accepted INA's request in the supplemental questionnaire to rely on INA's original reporting.[6]

---

If Torrington believes Commerce should not have accepted INA's original questionnaire response,

*See* INA's Supplemental Questionnaire Response, P.R.Doc. No. 165, Def.'s App., Ex. 5, at 29. Accordingly, Commerce is sustained on this issue.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to allow it to: (1) deduct imputed interest for INA's credit expenses and inventory carrying expenses from constructed COP; (2) adjust the profit calculation for INA for the differences between sales COP and constructed value COP; (3) apply a tax-neutral amount methodology in computing the VAT adjustment; (4) deny the adjustment to FMV for FAG's negative billing adjustments, post-sale price adjustments, and third-party discounts; (5) allow a direct adjustment to FMV for SKF's rebate 2; and (6) explain the circumstances in which Commerce will apply the reimbursement regulation in ESP situations. The Final Results, to the extent challenged herein, are sustained in all other respects.

Torrington should have raised the issue at the administrative level.